# STATE OF ILLINOIS
# ILLINOIS LABOR RELATIONS BOARD
# LOCAL PANEL

| | | |
|---|---|---|
| Erik Slater, | ) | |
| | ) | |
| Charging Party, | ) | |
| | ) | |
| and | ) | Case No. L-CA-16-017 |
| | ) | |
| Chicago Transit Authority, | ) | |
| | ) | |
| Respondent. | ) | |

## DECISION AND ORDER OF THE ILLINOIS LABOR RELATIONS BOARD
## LOCAL PANEL

On September 18, 2017, Administrative Law Judge Anna Hamburg-Gal (ALJ Hamburg-Gal) issued her Recommended Decision and Order (RDO), finding the Chicago Transit Authority (CTA or Respondent) engaged in unfair labor practices within the meaning of Sections 10(a)(2) and (1) of the Illinois Public Labor Relations Act, 5 ILCS 315 (2014), as amended (Act).

The RDO includes recommendations on various issues regarding whether Respondent engaged in unfair labor practice when it allegedly: (i) ordered ATU Local 241 to vacate the office space that it had used for approximately five months; (ii) removed postings and flyers concerning the Union from all areas of the garage; (iii) postponed all grievances and hearings involving Slater and hearings where Slater was to be the Union representative for unit members; (iv) told Slater he did not have permission to speak at a meeting and threatened to charge Slater with insubordination when he began to speak out on safety issues on behalf of union members; (v) informed Slater that no union discussions could take place on CTA property, including discussions regarding the Chicago Teachers' Union strike, without prior approval by management and that a manager needed to be present; and (vi) threatened Slater with discipline for making photocopies for the Union on CTA copy machines. The ALJ determined Respondent engaged in unfair labor practices in several,

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000002

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 2 of 53 PageID #:30

but not all, of these instances, including the denial of the use of offices space and the directive not to discuss the CTU strike on CTA property.

The Respondent filed twenty-one separate exceptions to the RDO, the majority of these relating to the elimination of the Union's use of the office space and Respondent's directive that Charging Party may not discuss the CTU strike on CTA property. Charging Party timely responded to Respondent's exceptions.

After reviewing the RDO, the Respondent's exceptions, the Charging Party's response, and the record, we adopt the ALJ's recommendations for the reasons stated in the RDO except for her recommendations regarding Respondent's denial of the use of office space which we reject as discussed below:

Charging Party, Erik Slater, is employed by the Respondent as a Bus Operator assigned to its North Park Garage (Garage). The Respondent's Bus Operators are represented by the Amalgamated Transit Union, Local 241 (Union). Slater was elected to the Union's Executive Board on January 27, 2015.[1]

The Union had use of an office space in the Garage beginning in December of 2014. The Union did not use the office on a daily basis and would ask the CTA for permission to use the office, as they did not have keys to it. The Union used the office space to speak to membership in private, interview grievant, and store records. The CTA occasionally used the office to conduct picks of bus runs, which occur approximately six times a year, with each pick taking several days to complete, and as storage.

At some point in early 2015, a CTA Facilities Maintenance Manager asked Gilberto Hernandez (Hernandez), the Administrative Manager at the Garage, for office space closer to his

---

[1] The Union President subsequently removed Slater on March 19, 2015, but reinstated him three weeks later.

2

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000003

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 3 of 53 PageID #:31

area of responsibility, which included the area in which the Garage was located. Almost immediately after Slater was reinstated to his position on the Union's Executive Board on April 6, 2015, Hernandez approached Slater, who was in the Union office, and informed him that the Union could no longer use the office.

ALJ Hamburg-Gal found that Respondent CTA violated 10(a)(1) when it removed the Union from the office it had occupied for several months in retaliation for Slater's protected activity at the March 7, 2015 rap session, as well as due to Slater's status of Union Executive Board member, both protected activity under the Act. The ALJ found these instances of protected activity were known by the Respondent, that the removal of the office was an adverse employment action, and that it was motivated by Slater's protected activity due to the timing of the removal and shifting reasons for the removal provided by Hernandez. She likewise concluded that the CTA purported legitimate business reason for removal of the office—that it was needed for a Facilities Maintenance Manager—was a pretextual, post-hoc justification.

ALJ Hamburg-Gal also found that the CTA violated Section 10(a)(2) and, derivatively, Section 10(a)(1) of the Act when it revoked access to the Union office, for substantially the same reasons as the 10(a)(1) violation, but additionally concluding that such was done to discourage support for the Union, since the action was taken almost immediately after Slater resumed his position on the Union's Executive Board.

With respect to the office space issue, the Respondent excepts to the ALJ's recommendations, contending it was not obligated to grant the Union use of the office space in the first place, that the Union's use of the office was short-lived, and that the RDO now effectively grants the Union use of the office space into perpetuity. It further asserts that the elimination of the Union office was not an adverse action, that the timing and shifting reasons were insufficient

3

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000004

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 4 of 53 PageID #:32

to justify a finding of retaliation, and that it has advanced a legitimate business reason for removing the office—it needed the space for its Facilities Maintenance initiative. With respect to the finding such violated 10(a)(2), it asserts that the evidence used to conclude that the CTA acted with specific intent to discourage union support was insufficient, as it was simply a regurgitation of the same reasons which supported the 10(a)(1) finding. Further, it asserts that it had no obligation to communicate to either Slater or Mormon, or any Union, why the CTA needed full-time use of its office space. Finally, it takes exception to several of the ALJ's credibility determinations with respect to the office space, including not crediting Hernandez's testimony.

We find the CTA's exceptions to be persuasive and reject the ALJ's findings and recommendations regarding the use of office space. We agree with the Respondent's exceptions and find that its elimination of the Union's use of office space is not an adverse action.

The ALJ erred in equating the Respondent's grant of permission to use the empty office with giving the Union a designated office. Contrary to the ALJ's findings, the record indicates the Union and, consequently, Slater, had no proprietary interest in the office space. The office space in question cannot be characterized as belonging to the Union. The Union's use of the office was temporary and permission to use it was given at the convenience of CTA management. The record indicates CTA management kept the key to the office in question and it was management that unlocked the door to let in Union representatives and then locked the office when the Union was finished using the office. The record also indicates the Union did not have exclusive use of the office as CTA management conducted its picks out of that office. Moreover, the cases cited by ALJ and Charging Party his response finding the removal or relocation of union offices to be an unfair labor practice, are distinguishable in that they all

4

involved instances where the union had a proprietary interest in a designated office. See, e.g., Chicago Transit Authority, 30 PERI ¶ 9 (IL LRB-LP 2013).

Because we find that the Respondent's denial of the use of the office space in question is not an adverse action, we need not address the remainder of the ALJ's determinations regarding the office space allegations. Accordingly, we reject the ALJ's findings and conclusions regarding the establishment of Charging Party's *prima facie* for the Sections 10(a)(1) and 10(a)(2) and find the Respondent did not engage in unfair labor practices within the meaning of Section 10(a)(1) and Sections 10(a)(2) and 10(a)(1) when it eliminated the Union's use of the office space in question.

BY THE LOCAL PANEL OF THE ILLINOIS LABOR RELATIONS BOARD

/s/ Robert M. Gierut
Robert M. Gierut, Chairman

/s/ Charles E. Anderson
Charles E. Anderson, Member

/s/ Angela Thomas
Angela Thomas, Member

Decision made at the Local Panel's public meeting held in Chicago, Illinois, on March 6, 2018; written decision approved at Local Panel's public meeting held in Chicago, Illinois, on April 17, 2018, and issued on April 17, 2018.

5

# NOTICE TO EMPLOYEES

## FROM THE

## ILLINOIS LABOR RELATIONS BOARD

### Case No. L-CA-16-017

The Illinois Labor Relations Board, Local Panel, has found that the Chicago Transit Authority has violated the Illinois Public Labor Relations Act and has ordered us to post this Notice. We hereby notify you that the Illinois Public Labor Relations Act (Act) gives you, as an employee, these rights:

- To engage in self-organization
- To form, join or assist unions
- To bargain collectively through a representative of your own choosing
- To act together with other employees to bargain collectively or for other mutual aid and protection
- To refrain from these activities

Accordingly, we assure you that:

WE WILL cease and desist from interfering with, restraining or coercing our employees in the exercise of the rights guaranteed them in the Act.

WE WILL cease and desist from threatening the Charging Party, Erek Slater, for engaging in protected, concerted activity.

WE WILL cease and desist from limiting Union postings to the Union bulletin Board while barring them from other areas specifically designated for personal and commercial postings.

WE WILL cease and desist from instructing the Charging Party, Erek Slater, to not discuss the Chicago Teachers Union on CTA property.

WE WILL cease and desist from, in any like or related manner, interfering with, restraining or coercing our employees in the exercise of the rights guaranteed them in the Act.


DATE _____

_____
Chicago Transit Authority
(Employer)




# ILLINOIS LABOR RELATIONS BOARD

**One Natural Resources Way, First Floor**      **160 North LaSalle Street, Suite S-400**

**Springfield, Illinois  62702**      **Chicago, Illinois  60601-3103**

**(217) 785-3155**      **(312) 793-6400**


## THIS IS AN OFFICIAL GOVERNMENT NOTICE

## AND MUST NOT BE DEFACED.

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4_000007

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 7 of 53 PageID #:35

**STATE OF ILLINOIS**
**ILLINOIS LABOR RELATIONS BOARD**
**LOCAL PANEL**

Erek Slater,                                              )
                                                         )
                    Charging Party,                      )
                                                         )
        and                                              )          Case No. L-CA-16-017
                                                         )
Chicago Transit Authority,                               )
                                                         )
                    Respondent                           )

**ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION AND ORDER**

On September 4, 2015, Erek Slater (Charging Party or Slater) filed a charge with the Illinois Labor Relations Board's Local Panel (Board) alleging that the Chicago Transit Authority (Respondent or CTA) engaged in unfair labor practices within the meaning of Sections 10(a)(2) and (1) of the Illinois Public Labor Relations Act (Act) 5 ILCS 315 (2014), <u>as amended</u>. The charge was investigated in accordance with Section 11 of the Act. On January 20, 2016, the Board's Executive Director issued a Complaint for Hearing.

A hearing was conducted on April 10 and 12, and on May 10 and 23, 2017, in Chicago, Illinois, at which time the Charging Party presented evidence in support of the allegations and all parties were given an opportunity to participate, to adduce relevant evidence, to examine witnesses, to argue orally, and to file written briefs. After full consideration of the parties' stipulations, evidence, arguments, and briefs, and upon the entire record of the case, I recommend the following:

I.      **PRELIMINARY FINDINGS**

The parties stipulate and I find that:

1.  At all times material, the Respondent has been a unit of local government under the jurisdiction of the Local Panel of the Board, pursuant to Section 5(b) of the Act.

2.   At all times material, the Respondent has been a public employer within the meaning of Section 3(o) of the Act.

1

3. At all times material, the Charging Party has been employed by the Respondent as a bus driver and has been a public employee within the meaning of Section 3(n) of the Act.

4. The Amalgamated Transit Union Local 241 (Union) is the exclusive representative of a bargaining unit (Unit) comprised of certain employees employed by the Respondent, including employees in the title of Bus Driver.

5. At all times material, the Charging Party has been a member of the Union, an executive board member, and a business agent.

## II.      ISSUES AND CONTENTIONS

The first set of issues in this case is whether the Respondent violated Sections 10(a)(2) and (1) of the Act when it allegedly (i) ordered ATU Local 241 to vacate the office space that it had used for approximately five months, (ii) removed postings and flyers concerning the Union from all areas of the garage, and (iii) postponed all grievances and hearings involving Slater and hearings where Slater was to be the Union representative for unit members.  The second set of issues is whether the Respondent independently violated Section 10(a)(1) of the Act by that same conduct, alleged above.  The third set of issues is whether the Respondent violated Section 10(a)(1) of the Act when (i) the General Manager allegedly told Slater he did not have permission to speak at a meeting and threatened to charge Slater with insubordination when he began to speak out on safety issues on behalf of union members, when (ii) Manager Jiaro Naranjo allegedly informed Slater that no union discussions could take place on CTA property without prior approval by management and that a manager needed to be present, and when (iii) Naranjo alleged threatened Slater with discipline for making photocopies for the Union on CTA copy machines.[1]

First, Slater argues that the Respondent's eviction of the Union from its office violated Section 10(a)(1) of the Act because it diminished the Union's capacity to represent bus drivers. Slater reasons that the Respondent thereby also violated Section 10(a)(2) of the Act because it removed the Union's office to retaliate against Slater for engaging in protected activities.  The

---

[1] The Complaint contains the additional allegation that the Respondent violated Section 10(a)(1) of the Act when General Manager Elizabeth Williams contacted the Union President and stated that the Charging Party would be fired if he was not removed from his union duties.  However, the Charging Party does not present any argument on this alleged violation on brief and offered no evidence in support of the claim that Williams made such statements to the Union President.  Accordingly, this allegation is not addressed below.

2

Respondent counters that it did not violate the Act by evicting the Union from its space because Slater suffered no adverse employment action and because the Respondent needed the space for a facilities maintenance manager's office.

Second, Slater contends that the Respondent violated Sections 10(a)(1) and (2) of the Act when its agents removed Union flyers from the garage walls because the Respondent thereby applied its posting policy in a discriminatory manner. The Respondent denies that it applied its policy in a discriminatory manner. It also asserts that it did not violate the Act when it removed Union flyers from the garage walls because Slater did not engage in protected activity when he posted the flyers and also did not suffer an adverse employment action. The Respondent additionally notes that it removed the flyers to further its legitimate business need of safety and maintaining smooth operations.

Third, Slater argues that the Respondent violated Sections 10(a)(2) and (1) of the Act when the Respondent postponed a grievance hearing, at which he represented a fellow employee, because it undermined Slater's reliability in the eyes of his coworkers. The Respondent denies that the postponement violated the Act, arguing that it was not an adverse employment action against Slater. The Respondent further notes that it harbored no illegal motive and that it canceled the meeting for the legitimate business reason that Manager Naranjo believed Slater was recording or transmitting the meeting to a third party without consent.

Fourth, Slater suggests that the Respondent violated Section 10(a)(1) of the Act when General Manager Williams threatened Slater with discipline for raising safety issues during an employee rap session. Slater notes that his conduct at the meeting retained the protections of the Act because he used no profanity and violated no rules. The Respondent denies that Slater's conduct at the meeting was concerted or protected. Even if it was, it lost the protections of the Act because Slater disrupted a safety meeting. The Respondent also notes that Slater suffered no adverse action and that the Respondent had a legitimate business for threatening Slater and instructing him to remain quiet because he was disrupting a safety meeting. In the alternative, the Respondent denies that the General Manager's instruction to remain quiet had any coercive effect where it contained no prospective threat that would chill a reasonable employees' future protected activity.

3

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000010

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 10 of 53 PageID #:38

Fifth, Slater argues that the Respondent violated Section 10(a)(1) of the Act when Naranjo ordered him not to discuss the Chicago Teachers Union (CTU) strike on CTA property.[2] Slater contends that he engaged in concerted activity when he attempted to encourage drivers to support CTU. He reasons that the Respondent had no overriding property interest in prohibiting his speech to off-duty employees in the breakroom and that the Respondent's prohibition of such discussion was overly broad, and motivated by union animus. The Respondent counters that Slater's discussions were not protected because Slater was not speaking on behalf of union members. In addition, the Respondent notes that Slater suffered no adverse employment action from Naranjo's directive. The Respondent denies that Naranjo's instructions were motivated by animus towards the Union and notes, instead, that Naranjo did not want Slater to disturb operators before their shifts. In the alternative, the Respondent contends that Naranjo's instruction did not have a reasonable tendency to interfere, restrain, or coerce reasonable employees in the exercise of their protected rights because Naranjo gave a narrow instruction that barred Slater's discussion of CTU only for the rest of that day.

Finally, Slater contends that the Respondent violated Sections 10(a)(1) and (2) of the Act when it discriminatorily denied Slater copying privileges because it acted in contravention of its past practices and a grievance settlement agreement. The Respondent counters that Slater's use of the copier was not protected activity because it was excessive. It similarly contends that it had a legitimate business reason for making the threat since Slater was tying up the Respondent's resources. In the alternative, the Respondent argues that Naranjo threatened Slater for his insubordinate refusal to leave the copy area and making a disturbance, not for making copies on behalf of the Union.

## III.    FINDINGS OF FACT

Gilberto Hernandez was the Administrative Manager at North Park Garage between 2012 or 2013 and May 2015. During that time, he also sometimes served as Acting General Manager. At all times material, Andrew Berry was a Transportation Manager I at the North Park Garage.

---

[2] Slater moves to amend the Complaint to add this more specific allegation because the Complaint includes only the more general allegation that Naranjo unlawfully prohibited Slater from engaging in "union discussions without prior approval by management," and without a manager present. The motion is granted, and the Complaint is hereby amended to conform to the evidence presented at hearing. 80 Ill. Adm. Code 1220.50(f).

4

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000010

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000011

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 11 of 53 PageID #:39

Jiaro Naranjo was Senior Manager of the North Park Garage from June 2015 to April 2017.  At all times material, Katharine Lunde was the Director of Labor Relations for the CTA.  Erek Slater is a bus operator assigned to the North Park Garage.

The Amalgamated Transit Union, Local 241 ("ATU Local 241" or "Union") represents the bus operators employed by the CTA.

In January 2015, Slater campaigned for the position of Executive Board member for ATU Local 241.  During the campaign season, the District Manager[3] called Slater into his office to review Slater's Union campaign literature.  He noted that he did not have a problem with most of the literature, but that he did have a problem with Slater's promise to turn the Union into a "battle-hardened organization" that was "able to defend the interest the interests of the 200,000 families" that the Union represents.

On January 27, 2015, the North Park Garage union members elected Slater as Executive Board member for ATU Local 241.[4]

1.  March 7, 2015 Rap Session

On March 7, 2015, the CTA held a rap session.  Approximately 30 to 50 bus operators attended the rap session.[5]  The purpose of the rap sessions was to address safety issues and facility maintenance issues.  CTA Safety Representative Marcus Patrick gave a 40-minute PowerPoint presentation on the CTA's safety management system.  Facility Improvements Project Manager Patrick Cimarusti, then gave a presentation on the CTA's new facilities maintenance initiative.  General Manager Liz Williams was also present on behalf of management.[6]  Gilberto Hernandez was in the vicinity, but did not participate in the meeting.

After Cimarusti finished his presentation, he opened the floor for discussion and asked for questions.  A number of operators asked safety-related questions.  Then Slater spoke.  He introduced himself as the elected Executive Board member of North Board Garage.  He then stated that he disputed the CTA's characterization of its safety policy as a change, and asserted that

---

[3] The identity of the District Manager in January 2015 is unclear.  However, in June 2015, the North District Manager was Jason Kierna.
[4] Slater was sworn in as an Executive Board member on March 10, 2015.
[5] The witnesses give different estimations of the number of bus operators in attendance.
[6] Jim Guidone arrived towards the end of the meeting.  His title does not appear in the record.

5

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000011

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000012

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 12 of 53 PageID #:40

management was not in fact introducing any changes. Bus drivers Melvin Williams and Baseemah Dear-Townsend confirmed that Slater's comments were safety-related.[7]

As Slater spoke, he moved to the front of the room, where the presenters were standing. Cimarusti perceived Slater's tone as confrontational. Williams interrupted Slater and informed him that his comments were off topic. Gil Hernandez similarly explained that this rap session was not the proper forum for the issues that Slater was raising. Williams spoke over Slater, but and Slater continued to speak, despite General Manager Williams's interruption and directive to stop. Slater stated that it was his right to speak and that Williams could not tell him to be quiet. He asked the operators whether they wanted him to continue to speak, to present the position of their union, and they responded affirmatively.

I credit bus driver Melvin Williams's testimony that the General Manager raised her voice at Slater, when she interrupted him, and that Slater then responded by raising his voice. Slater did not use any vulgar language. Williams then ordered Slater to be silent and made a formal threat of insubordination and termination. Slater did not speak further. However, other bus drivers then joined in to complain about CTA's past practices.

General Manager Williams cancelled the meeting because management lost control of it. According to Operator Melvin Williams, the General Manager threatened to call the Union President. Slater, Cimarusti and Operator Williams all confirm that General Manager Williams took out her phone after the meeting and made a call. However, there is no evidence that she in fact spoke to the Union President.

After Williams canceled the meeting, Cimarusti walked around the room to discuss issues with drivers in small groups at their tables. During these conversations, drivers raised issues of driver fatigue.

On March 19, 2015, the Union President removed Slater from his position at Executive Board member, but reinstated him three weeks later.

2. CTA's Removal of the Union Office

---

[7] Cimarusti denied that Slater raised safety issues and claimed that Slater instructed the drivers not to listen to management, but I do not credit this testimony because Cimarusti's account of the meeting lacked reliability in other respects. Most notably, Cimarusti contradicted his own claim that Slater interrupted his presentation by admitting that Slater spoke only after he opened the floor to questions.

6

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000013

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 13 of 53 PageID #:41

The North Park Garage is relatively small.  There are approximately eight offices at North Park Garage.  Five or six transportation managers use two of the offices, but the five or six managers do not occupy the office at the same time.

The Union had use of office space at North Park Garage beginning in December 2014.  The Union did not use the office every day during the months it had access to it.  The door to the office was always locked and Union representatives did not have keys to the office.  They needed to ask the CTA's permission to use it.  Union stewards and Executive Board members used the office to speak to the membership in private, to interview grievants, and to store records.

Slater understood that the identified space was the Union office because Union trustees Johnny Cole and Michael Morman had previously used that space and trained him there in January or February 2015.  In addition, General Manager Liz Williams pointed out that space as the union office, when Slater was first elected as Executive Board member.[8]

The Union never had exclusive use of the office.  Rather, the CTA used the office to conduct picks of bus runs, during which operators would select their assignments, and it also kept furniture and a computer there.[9]  Hernandez testified that he informed Slater that the Union could use the office while it was empty, but that the CTA reserved the first right to use the office if the need for it arose.  No member of CTA management ever informed Slater that the office space permanently belonged to the Union.

Sometime in early 2015, a facilities maintenance manager asked Hernandez for office space at the North Park Garage.  The CTA created the position of facilities maintenance manager as part of a new facilities maintenance initiative.  It assigned each facilities maintenance manager responsibility for a different sector of the city so that facilities issues could be addressed more efficiently.  The facilities maintenance manager responsible for the area that included the North Park Garage was searching for an office that was closer to his area of responsibility.  When he made the request, his office was located on the west side of the city.

 As noted above, Slater spoke out at a rap session on March 7, 2015.  The Union president removed him from his duties on March 19, 2015.  On April 6, 2015, the Union's Executive Board reinstated Slater to his position as Executive Board member, over the president's objections.

---

[8] Slater testified that he could not recall whether Williams expressly said that "this is the Union office."
[9] The CTA conducts picks approximately six times a year, and each pick takes several days to complete.

7

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000013

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000014

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 14 of 53 PageID #:42

Shortly after April 6, 2015, "almost immediately" after Slater returned to his Executive Board member duties, Hernandez approached Slater in the Union office and informed him that the Union could no longer use the space. Around this time, Hernandez separately informed Morman that the Union could no longer use the office.

I credit Slater's claim that Hernandez did not inform him why the Respondent needed the office space at the time Hernandez instructed Slater to vacate it. Although Hernandez claims he "believed" he told Slater that the Respondent needed the space for a facilities maintenance manager's office, Hernandez's memory of the interaction was hazy, and therefore not as reliable as Slater's. Hernandez's use of the word "believe" suggests that he was uncertain about what he told Slater. This uncertainty is underscored by the fact that he could not remember when he told Slater that the Union could no longer use the office space, where in the North Park Garage the conversation took place, or who else was present for the conversation. By contrast, Slater gave a more precise timeframe for when the interaction occurred, and he was also able to specify the location at which it took place.

For similar reasons, I credit Morman's description of his conversation with Hernandez. Morman testified in an earnest manner that Hernandez told him that the CTA needed to use the room because they were "moving the safety guys from the back to the front." He likewise asserted that Hernandez made no mention of a facilities maintenance initiative at the time. By contrast, Hernandez's impaired memory of a related conversation with Slater and his failure to provide a detailed account of his conversation with Morman weighs against crediting his claims to the contrary.

Sometime later, Slater learned that the Respondent decided to give the office space to a facilities maintenance manager. General Manager Williams made the decision, but Hernandez had influence over it.[10] Hernandez claims Williams decided to give the facilities maintenance manager the office space before Hernandez informed Slater that the Union could no longer have use of the office, but I do not credit this testimony. Had Williams already decided how to make use of the Union's office, when Hernandez told Slater to vacate it, Hernandez likely would have conveyed that reason to Slater and he would have conveyed the same reason to Morman. Yet, Hernandez did not offer Slater a reason when he instructed the Union to vacate its space. Moreover,

---

[10] The Union could not share the space with the facilities maintenance manager because the facilities manager handled confidential documents.

8

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000015

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 15 of 53 PageID #:43

Hernandez would not have given Morman a different justification for needing the space if Williams had already informed him that the Respondent planned to use the space for the facilities maintenance manager's office.

The witnesses dispute whether there was any vacant office space at the North Park Garage in April 2015, when Hernandez ordered the Union to leave the office it had previously used.  I credit the testimony of Hernandez and Berry, that there was no vacant office space, because Hernandez and Berry corroborated each other.  Hernandez testified that there was no vacant office space at North Park Garage in April 2015.  Berry similarly testified, albeit more broadly, that to his knowledge there was no vacant office space in 2015.  Although Hernandez conceded that office space sometimes becomes available for a short time, it quickly becomes occupied again.

While Slater testified that the credit union was vacant in April 2015, the reliability of this testimony is called into question by Slater's broader claim that the office had been vacant since January 2015, and that it remained vacant for the two years that preceded the hearing in this case.[11]  Naranjo directly contradicted Slater's broader claim by stating that the credit union office had in fact been his office during his tenure as North Park Senior Manager, which extend from June 2015 to at least December 2016.  Notably, Slater did not attempt to impeach Naranjo's testimony and instead took it at face value when questioning Naranjo, referring to the credit union office as "your office."[12]

At all times material to this case, the Union had access to a separate Union-rented space at 20 South Clark Street.  I take administrative notice of the fact that the Union's rented space is approximately 9-10 miles away from the North Park Garage, by car, and approximately an hour away, by public transportation during business hours.

3.  Copier Incident

The CTA allows employees to use the CTA copier to make copies of union-related documents, but the evidence indicates that the CTA does not permit employees to make an unlimited number copies.  For example, Bus Operator Morman stated that he understood that he could not make one hundred copies of documents using the copier.  In addition, Transportation

---

[11] See Tr. P. 626.
[12] Slater also identified other areas that were vacant at times, but not when they were vacant or how long they remained vacant.

9

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000016

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 16 of 53 PageID #:44

Manager Berry instructed Slater that he could make a few copies on the CTA copier, but not hundreds.

Sometime in September 2015, Naranjo and Slater had an interaction by the CTA copier, while Slater was using the machine. It undisputed that Naranjo instructed Slater to stop making copies and that at the end of the interaction, Naranjo threatened Slater with discipline for insubordination. The witnesses dispute the remaining details of the interaction including (1) the number of copies that Slater was making and (2) the particular impetus for Naranjo's threat.

I credit Naranjo's claim that Slater was making over a hundred copies of a document, and that he was not merely making copies of two, one-page information requests,[13] as Slater contends. In addition, I credit Naranjo's claim that he threatened Slater with discipline after Slater became angry and refused to leave the area. Although Naranjo's testimony on a related matter was inconsistent,[14] his testimony on the number of copies is more credible on the whole than Slater's for the following reasons. See In Re Daikichi Corp., 335 NLRB 622 (2001) (there is "nothing…more common in all kinds of judicial decisions than to believe some and not all of a witness's testimony").

First, Naranjo explained the impetus for his threat of insubordination, whereas Slater did not sufficiently explain the events that led up to the threat. Naranjo testified that he observed Slater making hundreds of copies, and asked him to stop. He explained that Slater then started shouting and telling the clerks, who were present at the time, that they were witnesses to Naranjo's illegal action. Naranjo further explained that he asked Slater to leave because he was being disruptive, and that when Slater refused, Naranjo threatened him with insubordination.

By contrast, Slater simply stated that Naranjo threatened him with discipline for using the photocopier to copy requests for information submitted to the CTA on behalf of union members. Although Slater did not deny that Naranjo gave him some directive during their interaction, Slater did not identify the directive that Naranjo claims he failed to immediately follow. Notably, Slater also did not contradict Naranjo's claim that Naranjo directed him to leave the area.

Second, Naranjo's claim that Slater was making excessive copies is more plausible than Slater's claim that he was making just two. Naranjo would have had no time to observe Slater's

---

[13] The information request form submitted into evidence is one page long.
[14] Naranjo initially testified that stopped Slater from copying a Union information request. He later claimed that that the materials appeared to be personal because they did not have a union logo on them.

10

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000016

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000017

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 17 of 53 PageID #:45

conduct, issue repeated instructions, and then threaten insubordination had Slater simply attempted to copy two documents. Rather, the copies would have been complete within less than a minute of having started, and there would have been no time for the interaction to take place. Slater would not have had occasion to defy any instructions; he simply would have left because his copy job would have been completed.

4. CTA's Removal of Union Flyers In and After June 2015

Throughout 2015, Slater regularly posted union flyers in the men's bathroom, on the front and back door, on the walls around the south doors, on the bulletin board next to the Union board, and on the Union bulletin board itself.

It is undisputed that prior to June 2015, flyers were commonly posted all over the walls, doors and the bathrooms at the North Park Garage. These included commercial flyers from corporations such as Walmart,[15] and personal announcements for parties and events.

In June, Naranjo became Senior Manager of North Park Garage. He transferred to North Park Garage from a different garage, where he held a similar position.

It is undisputed that at some point, following Naranjo's arrival at North Park Garage, he implemented a policy set forth in an email from CTA Vice President George Cavelle. Cavelle addressed the policy to the General Manager and Senior Management Staff, months earlier, on October 20, 2014. It stated the following in relevant part: "please insure that all paper signage, i.e., party reminders, 'quotes of the day,' department events, etc., [are] posted only on designated bulletin boards."

To implement the policy, Naranjo designated areas at the North Park Garages for certain types of postings. Naranjo testified that the North Park Garage has designated posting areas for reroutes, route terminal matters, OSHA compliance documents, and standard operating procedures. Bus driver Dear-Townsend testified that commercial and personal flyers remained posted in North Park Garage, but that those flyers were confined to their own, designated spaces. She explained that after the CTA changed its policy, the CTA still allowed employees to post personal flyers and advertisements, but that the CTA was simply "giving [employees] a certain area to post [their] flyers." The Union bulletin board is the designated location for union postings.

---

[15] Commercial corporations sometimes obtain permission from the CTA to post on the CTA walls.

11

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000018

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 18 of 53 PageID #:46

The Union bulletin board is behind glass and is kept locked. Naranjo confirmed that he told Slater many times to confine his postings to the Union bulletin board, the area designated for Union postings.

Managers perform security checks once a day and remove any postings that do not appear in their correct, designated areas. They remove flyers or postings from the garage walls if they are not CTA-related. While employees still sometimes post commercial and personal flyers outside the designated areas, the CTA swiftly removes them.

Naranjo explained that the CTA enforces its posting rules in part to ensure driver safety. The CTA posts notices about reroutes, which a driver may not see if he is distracted by other postings. If a driver proceeds on his customary route, without regard to the reroute, the driver could have an accident. Furthermore, if such notices are posted in designated areas, then drivers know where to find them.

The witnesses provided contradictory testimony regarding the date on which Naranjo began enforcing this policy. However, I credit Naranjo's testimony that he began enforcing the policy in June 2015, upon his arrival at North Park Garage. While Slater denied that the CTA began applying that policy in June, even Slater's own witness, bus operator Dear-Townsend, initially corroborated Naranjo's claim. She volunteered testimony that it was around May or June 2015 that "the CTA started…giving you a certain area to post your fliers and stuff like that…so a lot of flyers [were] moved to the front area….--by the management office."[16] In addition, Slater admitted that Naranjo informed him some time in 2015 that postings belonged in designated locations. In turn, it is reasonable to infer that Naranjo gave Slater these instructions as he removed the Union flyers from the men's bathroom and south interior doorway, sometime between June and September 2015. The photographs provided by Slater showing flyers on the walls are not helpful because Slater admits he took the photographs in April and May, before the CTA began enforcing its posting policy at North Park Garage. Indeed, they raise the question of why Slater did not take photographs of flyers on CTA walls in June, the month in which Naranjo allegedly removed Union flyers but left other non-union flyers posted.

---

[16] On redirect by Slater's attorney Kreitman, Dear-Townsend later claimed that the CTA changed its policy only after Slater filed his charge in this case in "summer of 2015," but Kreitman did not lay a foundation to show that Dear-Townsend knew when Slater filed his charge and he also did not provide her with the precise date Slater filed it. Accordingly, Dear-Townsend's subsequent testimony is of less value than her earlier, volunteered admission.

12

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000019

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 19 of 53 PageID #:47

5.  Slater's June 10, 2015 Conversation with Naranjo

It is undisputed that, on June 10, 2015, Naranjo instructed Slater that he could not discuss the CTU strike on CTA property.[17]  However, the witnesses dispute the impetus for the conversation and other specifics of the interaction.

I credit Naranjo's account of how the June 10, 2015, interaction began and Naranjo's impressions of the bus operators' demeanor because these matters are corroborated by other witness testimony.  Naranjo claims that he approached Slater because he heard a commotion in the breakroom.  Operator Morman's testimony similarly suggests that Naranjo approached Slater rather than the other way around, as Slater claims, because Attorney Kreitman characterized the interaction in that manner and Morman never disputed it.[18]  Although Slater contends that he approached Naranjo in advance, out of courtesy, such conduct seems incongruent with Slater's other interactions with management, which were less courteous.

I also credit Naranjo claim that he saw approximately 10 to 20 bus operators gathered in the breakroom on an unpaid break[19] and that the operators seemed upset.  Operator Dear-Townsend's general testimony about Slater's interactions with bus operators regarding CTU matters lends weight to this claim, although it is unclear whether she was describing the June 10, 2015 interaction in particular.   She recalled at least two occasions on which operators became upset with Slater because he was spending more time on CTU matters than on Local 241 issues.  Slater denied that any operator had ever voiced their disagreement with him or told him that he should express more support for Local 241 Union members than CTU members, but this testimony is incredible because his own witness, Dear-Townsend, contradicted him.

Naranjo then instructed Slater that he could not discuss the CTU strike on CTA property.  At hearing, Naranjo claimed that he was concerned that operators would forget their defensive driving habits if they were upset when they returned to their runs, but he did not mention this concern to the operators.  Indeed, CTA's answer suggests that it offered a different reason for this

---

[17] The CTA's answer states the following: "CTA admits that after the incident referenced in paragraph 15, Mr. Naranjo instructed Charging Party not to discuss the Chicago Teachers Union strike on CTA property."
[18] Q [Attorney Kreitman]: Regarding the discussion with Mr. Naranjo coming to tell Erek to stop talking about Teachers Union activities, were you off duty at that time, or were you on duty?
A [Morman]: Yes.  I was off duty.
[19] The CTA admits that the employees were on an unpaid break.

13

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000020

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 20 of 53 PageID #:48

directive because it asserted that its agent[20] told Slater that "his actions were a violation of CTA Rule 14(b)," which prohibits employees from leading fellow employees into a wildcat strike, work slowdown, or other impermissible job action. At hearing Naranjo testified that he could not remember whether he referenced that rule when addressing Slater.

However, I do not credit Naranjo's claim that he limited the prohibition on CTU discussions to one day only. To that end, I rely on the CTA's broad admission that "Naranjo instructed [Slater] not to discuss the Chicago Teachers Union strike on CTA property," which references no such limitation on Naranjo's instruction.

Nevertheless, I do not credit Slater's account of Naranjo's statements by default, despite Naranjo's less than forthright testimony, outlined above, because one of Slater's own witnesses corroborated Naranjo's claims. In the Complaint, Slater claims that Naranjo told him that no union discussions could take place without prior approval of management and that a manager needed to be present for Union discussions. Naranjo denied making these statements, and operator Michael Morman, who was also present at the June 10 meeting, likewise testified that he did not remember Naranjo telling Slater that no union discussions could take place on CTA property.

The meeting dispersed, and Slater and his coworkers then met at McDonald's to discuss CTU-related matters. Only five operators attended the meeting at McDonalds, but Slater expected that 20 would have come had the Union held the meeting at the garage.

Following the incident described above, Slater still spoke to union members about the CTU on CTA property one-on-one. He was not required to obtain permission to conduct these discussions and he was not required to hold these discussions in the presence of CTA management.

6. Bus Operator Walter Tidwell's October 2015 Disciplinary Hearing

In October 1, 2015, the CTA held a disciplinary hearing for bus operator Walter Tidwell. Slater, Tidwell, and Naranjo attended the hearing. Slater appeared on behalf of the Union to represent Tidwell. Naranjo appeared on behalf of the CTA.

Slater arrived at the meeting with his phone on. Shortly after the meeting began, a voice emanated from his phone. Naranjo told Slater that he had not given him his consent to be on a call with anyone else. Naranjo became upset and asked Slater whether he was recording him. Slater denied he was recording Naranjo. Naranjo then ended the meeting.

---

[20] The CTA's answer does not identify the speaker.

14

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000021

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 21 of 53 PageID #:49

Although Slater claimed he informed Naranjo when the meeting began that he was on hold with First Vice President Valerie Matthews, this testimony is not credible. Matthews' voice on the phone would not have triggered Naranjo's decision to end the meeting, had Slater given Naranjo advance notice that he was on hold and that Matthews might therefore come back on the line at some point. Moreover, had Naranjo simply been "paranoid" that Slater was recording him, as Slater contends, surely Naranjo would have inquired about his phone and Slater's intent to record before the voice emanated from it. Slater's testimony on this matter is further impaired by his less than credible claim that he muted his side of the phone call. There would have been little reason for Slater to have muted his side of the call if he was simply on hold because there would have been no one on the line to hear his side of the conversation.

By contrast, Naranjo credibly testified that he ended the meeting shortly after it began because he believed Slater was using his phone to either record the hearing and/or to transmit it to a third party.[21] Naranjo testified had heard rumors from other members of CTA management that Slater liked to record conversations with management, and the existence of such rumors cannot be reasonably disputed. Two other members of CTA management testified that they likewise believed that Slater had tried to record them.[22] Slater himself admitted that several CTA managers had previously instructed him not to record them during disciplinary hearings, though he denied that he had ever recorded anyone without their consent. Naranjo further explained the basis for his belief that Slater was recording him in this case, noting that Slater was surprised that the voice came out of the phone and tried to shut it off.

Immediately after Tidwell's disciplinary hearing, Slater emailed Naranjo and Union officials stated that "all hearings were unilaterally postponed by the Snr. Manager [Naranjo]." In fact, Naranjo and Union Vice President Valerie Mathews agreed to a "notice of further investigation," which allowed the parties to reschedule the hearing to a later date while adhering

---

[21] The CTA does not allow anyone to record disciplinary hearings of its employees because such recording is prohibited by Illinois law without the consent of both parties. In addition, it is an invasion of privacy, and audio recordings can be easily manipulated.

[22] Acting General Manager Hernandez likewise testified that, when Slater first became a Union representative, he tried to record an interview of a bargaining unit member by management using a micro recorder. He placed the recorder on the table and stated that he wanted to record the meeting. Hernandez explained that Slater could not record the meeting. Slater denied that he had ever tried to record Hernandez and he likewise denied owning a micro recorder. Transportation Manager Berry testified that he believed Slater has tried to record him. Berry based his belief on the manner in which Slater held up his phone--chest high, flat in his hand, with the screen up. Slater likewise denied recording Berry.

15

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000022

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 22 of 53 PageID #:50

to contractual timelines for disciplinary action.[23]  Bus Operator Michael Morman signed the document on the Union's behalf, at First Vice President Matthews's direction.

Naranjo has conducted approximately 20 disciplinary hearings in which Slater represented unit employees as on behalf of the Union.  Naranjo credibly testified that the CTA did not postpone any other disciplinary hearings in which Slater represented unit employees as a Union Executive Board Member.  He similarly testified that Tidwell's grievance hearing was the only hearing that the CTA postponed.  Although Slater claimed in an email, dated October 1, 2015, that Naranjo informed him that "all hearings were unilaterally postponed by the Snr. Manager," Slater did offer testimony to this effect.  Accordingly, Naranjo's testimony is afforded greater weight here.

## IV.    DISCUSSION AND ANALYSIS

### 1.  Section 10(a)(1) Allegations

The Respondent violated Section 10(a)(1) of the Act when it (i) threatened the Charging Party with discipline on March 7, 2015, if he continued to speak at the rap session, (ii) limited Union postings to the Union bulletin Board while barring them from other areas specifically designated for personal and commercial postings,[24] (iii) removed the Union from the office it had occupied for several months, and (iv) instructed Slater that he could not discuss the Chicago Teachers Union strike on CTA property.  However, the Respondent did not violate Section 10(a)(1) of the Act when it (i) removed Union flyers from the walls in June 2015, (ii) postponed a single grievance hearing at which Slater represented a union member, (iii) threated the Charging Party with insubordination if he did not leave the copy area; and (iv) purportedly instructed the Charging Party that he could not have union discussions on CTA property without approval of management and without a manager present.

A respondent violates Section 10(a)(1) of the Act when it engages in conduct which reasonably tends to interfere with, restrain, or coerce employees in the exercise of rights protected by the Act.  City of Lake Forest, 29 PERI ¶ 52 (IL LRB-SP 2012); City of Mattoon, 11 PERI ¶ 2016 (IL SLRB 1995); Clerk of the Circuit Court of Cook Cnty., 7 PERI ¶ 2019 (IL SLRB

---

[23] The contract provides that the CTA has 15 days from the date of an infraction to notify an employee of potential discipline. The CTA then has 10 days from the notification to execute the discipline.  The Notice of Further Investigation is a document that the Union and CTA management sign to extend the timeline.
[24] As discussed below, the Complaint is amended to add this allegation because doing so conforms the pleadings to evidence presented.

16

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000023

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 23 of 53 PageID #:51

1991); Ill., Dep't. of Cent. Mgmt. Servs. (Dept. of Conservation), 2 PERI ¶ 2032 (IL SLRB 1986); City of Chi., 3 PERI ¶ 3011 (IL LLRB 1987).  Generally, a showing of illegal motive is not required to prove a violation of Section 10(a)(1) of the Act.  City of Mattoon, 11 PERI ¶ 2016; Ill., Dep't. of Cent. Mgmt. Servs. (Dept. of Conservation), 2 PERI ¶ 2032.  Instead, the test is whether the employer's conduct, viewed objectively from the standpoint of a reasonable employee, had a tendency to interfere with, restrain or coerce the employee in the exercise of a right guaranteed by the Act. Clerk of the Circuit Court, 7 PERI ¶ 2019; Ill., Dep't. of Cent. Mgmt. Servs. (Dept. of Conservation), 2 PERI ¶ 2032.

However, where a charging party alleges that the employer violated Section 10(a)(1) of the Act by taking an alleged adverse employment action against him because of, and in retaliation for, the exercise of protected rights, the analysis must track the one used in cases arising under Section 10(a)(2) of the Act. Vill. of Oak Park, 18 PERI ¶ 2019 (IL SLRB 2002); Vill. of Schiller Park, 13 PERI ¶ 2047 (IL SLRB 1997).  Accordingly, in such cases, the charging party must prove, by a preponderance of the evidence, that he engaged in protected activity, that respondent knew of that activity, and that the respondent took adverse action against him as a result of his involvement in that activity.  Vill. of Schiller Park, 13 PERI ¶ 2047 (IL SLRB 1997) (citing Gale and Chicago Housing Authority, 1 PERI ¶ 3010 (IL LLRB 1985)).

There is no merit to the Respondent's claim that the 10(a)(2)-type analysis applies to every alleged violation of Section 10(a)(1) set forth in the Complaint.  While the Section 10(a)(2)-type analysis applies to the Respondent's allegedly unlawful removal of the union office, the reasonable employee test applies to the remaining Section 10(a)(1) allegations.

Two of the Section 10(a)(1) allegations address threats, to which the reasonable employee test unquestionably applies.  See Clerk of the Court of Cook County, 7 PERI ¶ 2019.  The Respondent argues that the threats at issue in this case require proof of unlawful motive because Slater alleges that the Respondent made the threats in retaliation for his protected activity, but this is incorrect.  In fact, the same analysis applies to threats irrespective of whether the they constitute a retaliatory response to an employee's past protected activity or instead foreshadow consequences for protected activity that employees might undertake in the future.  In either event, the analysis considers whether the statement, when viewed objectively from the standpoint of a reasonable employee, has a tendency to interfere with, restrain or coerce the employee in the exercise of a

17

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000024

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 24 of 53 PageID #:52

right guaranteed by the Act.[25] Compare Chicago Transit Auth. v. Illinois Labor Relations Bd., 386 Ill. App. 3d 556, 573 (1st Dist. 2008) (applying reasonable employee test to employer's threat, made in response to employees who engaged in protected handbill distribution, that announced intent to impose discipline for similar conduct) and Township of Worth, 3 PERI ¶ 2019 (IL SLRB 1987) (applying reasonably employee test to supervisor's threat of imposing wage cut in response to news of unionization efforts) with City of Chicago, Chicago Police Department (Kostro), 3 PERI ¶ 3028 (IL LLRB 1987) (applying reasonable employee test applied to threat by supervisor that he would change employee's schedule if employee filed a grievance).

Notably, the Respondent cites to no case in which the Board declined to apply the "reasonable employee" analysis to a threat on the grounds that the threat constituted retaliation for protected activity. In fact, every case cited by the Respondent in support of this claim reinforces the conclusion—advanced in this RDO above—that the Board applies the Section 10(a)(2)-type analysis to alleged retaliatory adverse employment actions arising under Section 10(a)(1), and not alleged retaliatory threats. Pace Suburban Bus Div. of Reg'l Transp. Auth. v. Illinois Labor Relations Bd., 406 Ill. App. 3d 484, 494-95 (1st Dist. 2010) (Section 10(a)(2)-type analysis applied to alleged retaliatory termination arising under Section 10(a)(1)); State of Ill, Dept. of Cent. Mgmt Servs. (State Police), 30 PERI 70 (IL LRB-SP 2013) (Section 10(a)(2)-type analysis applied to alleged retaliatory suspension); Chicago Hous. Auth., 6 PERI 3013 (IL LLRB 1990) (Section 10(a)(2)-type analysis applied to allegedly discriminatory denial of promotion and involuntary transfer) (emphasis added); Neponset Comm. Unit. School Dist. No. 307, 13 PERI 1089 (IELRB 1997)("we must determine what test should be applied to alleged violations of Section 14(a)(1) of the Act *which consist of adverse employment action* because of protected activity")(emphasis added).

Similarly, two of the other Section 10(a)(1) allegations pertain to union solicitation and/or distribution of union materials on the Employer's premises, likewise analyzed under the reasonable employee test. See cases infra.

The remaining Section 10(a)(1) allegation, related to the Respondent's alleged postponement of grievance hearings, similarly does not mandate a Section 10(a)(2)-type analysis,

---

[25] There is no difference between a "retaliatory threat" and a "prospective threat" for purposes of the Section 10(a)(1) analysis, as the Respondent contends on brief. All threats are prospective, by definition, because they communicate an intent to take some future action that is adverse to the listener, its subject.

18

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000025

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 25 of 53 PageID #:53

given the Complaint's language and the Board's policies. The Complaint sets forth an independent Section 10(a)(1) allegation, which simply alleges that the Respondent interfered with, coerced, and restrained the Charging Party's exercise of protected rights by postponing the Charging Party's grievance hearings and hearings at which the Charging Party represented unit members. It does not claim that the Respondent took an adverse action against the Charging Party in retaliation for his protected activity.

The Respondent contends that this Section 10(a)(1) claim, and the others, are in fact derivative of the Section 10(a)(2) allegations, such that the 10(a)(2) analysis must apply, but the Complaint does not support the Respondent's assertion. A Section 10(a)(1) allegation is derivative when it arises as a result of another violation of the Act and stems from the same conduct. City of Chicago, 31 PERI ¶ 129 (IL LRB-SP 2015). The Board's complaints traditionally indicate a derivative Section 10(a)(1) allegation by stating the primary allegation and following it with the phrase "and (1)," e.g. "Section 10(a)(2) and (1)." Lincolnway Police Communications Center, 25 PERI ¶ 67 n. 13 (IL LRB-LP ALJ 2009). In cases where the Section 10(a)(1) claim is derivative, the Board finds a violation of Section 10(a)(1) only if the Board sustains the violation on which it is based. City of Chicago, 31 PERI ¶ 129.

Here, the Section 10(a)(1) allegation is distinct from the Section 10(a)(2) allegation because it appears in a different paragraph and separately alleges that the Respondent restrained or coerced public employees in the exercise of rights guaranteed under the Act. It does not allege that the Respondent took the identified conduct to retaliate against public employees to discourage membership in or support for the Union, as does the Section 10(a)(2) allegation. The separate nature of the independent[26] Section 10(a)(1) allegation is rendered even clearer, here, because the Executive Director also included a derivative[27] Section 10(a)(1) allegation in the Complaint, and the two types of Section 10(a)(1) allegations are easily juxtaposed. Had the Executive Director intended the all of the Section 10(a)(1) allegations to be derivative, she would not have placed

---

[26] The independent Section 10(a)(1) allegation provides that, "[b]y its acts and conduct as described in paragraphs 9, 10, 13, 14, 16, 17 and 18 the Respondent restrained or coerced public employee in the exercise of rights guaranteed under the Act, in violation of Section 10(a)(1) of the Act."

[27] The derivative Section 10(a)(1) allegation (paragraph 20) is clearly linked to the Section 10(a)(2) allegation and provides that, "[b]y its act and conduct as referenced in paragraph 13, 14, and 18, the Respondent has discriminated against public employees in order to discourage membership in or support for the Union, in violation of Sections 10(a)(2) and (1) of the Act."

19

some of them in a separate paragraph and rendered them distinct from, and independent of, the Section 10(a)(2) allegations.

Finally, there is no merit to the Respondent's assertion that the 10(a)(2)-type analysis applies to all the 10(a)(1) claims that arise from the same conduct as the Section 10(a)(2) claims. There are some circumstances in which the Board has declined to apply both a "reasonable employee test" and the motive-based test to the same instance of alleged misconduct, but those circumstances are not presented here. The Board does not apply the Section 10(a)(1) "reasonable employee" analysis where a respondent has taken adverse action against a charging party for legitimate and necessary reasons. City of Elmhurst, 17 PERI 2040 n. 5 (IL LRB-SP 2001). Yet in this case, as discussed below, the Respondent has taken no adverse employment actions against Slater for legitimate and necessary reasons. Accordingly, application of the reasonable employee test in this case would not "inevitably deprive the Employer of its right to take legitimate and necessary employment actions for fear that its conduct would be construed as retaliatory by employees…." Cf. City of Elmhurst, 17 PERI 2040 n. 5 ("an employer's bad faith motive is determinative when an employer takes adverse action against employees").[28] By extension, the presence of both 10(a)(2) and 10(a)(1) allegations in the complaint should not automatically foreclose application of the only analytical framework that has any potential for success, even though there is some overlap in the conduct that supports the two separate claims. See Ill., Dep't. of Cent. Mgmt. Servs. (Dept. of Conservation), 2 PERI ¶ 2032 (applying independent Section 10(a)(1) analysis to posted schedule change, which was later withdrawn, where Section 10(a)(2) analysis failed for want of an adverse employment action).

Each alleged violation of Section 10(a)(1) of the Act is addressed below, applying the principles set forth above.

1. General Manager Williams's Directive that Slater Refrain from Speaking at the March 7, 2015 meeting and her Threat of Discipline if he Continued, 10(a)(1)

The Respondent violated the Act when General Manager Williams told Slater to stop speaking at the March 7, 2015 meeting and threatened him with discipline if he continued.

---

[28] The Board has also held that in cases where employers have withheld scheduled wage increases or benefits because of the pendency of representative proceedings, an employer's motive is irrelevant. City of Chicago, 3 PERI 3011 (IL LLRB 1987). Clearly, the facts of this case are different and this exception does not apply.

20

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000026

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000027

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 27 of 53 PageID #:55

General Manager Williams's threat had a tendency to interfere with, restrain or coerce a reasonable employee in the exercise of protected rights under the Act because her threat issued in direct response to Slater's protected activity—Slater's complaints about workplace safety, made during a group meeting.

As a preliminary matter, Slater engaged in protected, concerted activity on March 7, 2015 when he attempted to bring safety concerns to the attention of management at a group meeting. Concerted activity "encompasses those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." Bd. of Educ. of Schaumburg Comm. Consolidated School Dist. 54 v. Ill. Educ. Labor Rel. Bd., 247 Ill. App. 3d 439, 455 (1st Dist. 1993) (addressing similar language under the Illinois Educational Labor Relations Act, 115 ILCS 5) (citing Meyers II, 281 N.L.R.B. 882, 887 (1986)). In determining whether activity is concerted, the National Labor Relations Board considers additional factors including "(1) whether the comments involved a common concern regarding conditions of employment, and was the issue framed as a common concern; and (2) the context under which the alleged concerted activity occurred—did the employer address the employees as a group." In Re Air Contact Transp., Inc., 340 NLRB 688, 695 (2003), enforcement granted sub nom. N.L.R.B. v. Air Contact Transp. Inc., 403 F.3d 206 (4th Cir. 2005).

Here, Slater raised concerns about work place safety, which is undoubtedly a common concern regarding employees' conditions of employment. Specifically, Slater sought to raise management's attention to the fact that the CTA's "new" safety initiatives were not in fact new. The inescapable implication of his comments was that management had not adequately addressed safety concerns in the past, and that it was merely paying lip service to employees' safety concerns by couching an old, ineffective approach as something new. Accordingly, Slater's comments cannot simply be viewed as empty criticisms of management or griping, devoid of constructive aim, as the Respondent suggests, but rather an attempt to get management to address safety concerns that they had not adequately remedied in the past. Lou's Transp., Inc., 361 NLRB No. 158 (2014)(work place safety is a matter of "fundamental concern" to employees); St. Bernard Hospital and Health Care Center, 360 NLRB No. 12, slip op. at 9 (2013) ("an employee who raises safety issues with his employer is engaged in concerted activity that is protected"); cf. Mushroom

21

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000028

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 28 of 53 PageID #:56

Transp. Co. v. N. L. R. B., 330 F.2d 683, 685 (3d Cir. 1964) (employee's individual conversations with other employees were "mere griping" because it "look[ed] forward to no action at all").

Moreover, the context of Slater's statements also weighs in favor of finding that his actions were concerted. Slater raised his concerns about employee safety at a group meeting geared towards safety issues, during which other employees endorsed his comments and then joined the discussion he initiated. An employee engages in concerted activity when he or she acts with or on the authority of other employees. Bd. of Educ. of Schaumburg Comm. Consolidated School Dist. 54, 247 Ill. App. 3d at 455. But even a single "employee who protests publicly in a group meeting is engaged in initiating group action." Wyndham Resort Development Corp., 356 NLRB 765, 766 (2011) (single employee's protest of change in dress code in group meeting was concerted and protected). It is clear that Slater's comments sought to initiate group action and that he also acted with other employees. While Slater started speaking without any pre-approved plan by the employee group, he garnered the support of other employees as he continued, and explicitly asked them whether they wanted him to keep speaking—they said they did. Although Slater ultimately stopped speaking after General Manager Williams threatened him with discipline, other employees chimed in, and Slater's initiation of group action is therefore undeniable.

The Respondent suggests that Slater's activity was not concerted because the employees did not agree in advance that Slater would be their spokesman at the meeting; however, the NLRB has "found concerted activity when a second employee joins an individual employee's protest without requiring evidence of a previous plan to act in concert." Wyndham Resort Development Corp., 356 NLRB 765, 766 (2011). That rationale applies here, where other employees joined Slater's protest by raising similar concerns after he made his statements.[29] While employees in this case were not protesting a unilateral change, as were the employees in Wyndham, they were protesting what they viewed to be an ineffective response to safety concerns.

Moreover, Slater's conduct remained protected given the place of the discussion, its subject matter, and the manner in which Slater conveyed his message. The Illinois Labor Relations Board has adopted the NLRB's approach to determining whether direct communications, face-to-face in the workplace, between an employee and a manager or supervisor constitutes conduct so

---

[29] Although the precise nature of employees' subsequent statements does not appear in the record, there is sufficient evidence that they were in the same vein as Slater's. Had they simply agreed with management's position that the safety initiates were new, or otherwise adequate, then Williams would have seen no need to end the meeting.

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000029

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 29 of 53 PageID #:57

opprobrious that the employee loses the protection of the Act. <u>Chicago Hous. Auth.</u>, 1 PERI ¶ 3010 (employee lost the protections of the Act where he physically assaulted supervisor) (<u>citing Atlantic Steel Co.</u>, 245 NLRB 814 (1979). An employee does not lose the protection of the Act unless his misconduct is so violent or of such character as to render the employee unfit for further service. <u>Chicago Transit Auth.</u>, 30 PERI 9 (IL LRB-LP 2013). Accordingly, "the rights of employees to engage in protected activity should prevail unless the employer can demonstrate special circumstances indicating a restriction on activity is necessary for the maintenance of safety, efficiency or discipline." <u>Chicago Transit Auth.</u>, 30 PERI 9 <u>citing Village of Bensenvill</u>e, 10 PERI ¶ 2009 (IL SLRB 1993) (internal quotes omitted).

The NLRB has set forth four factors to help determine whether an employee's conduct loses the protections of the Act.[30] These include (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice. <u>Atlantic Steel</u>, 245 NLRB 816 (1979). These factors are considered in turn below.

First, the location of the safety discussion weighs in favor of finding that Slater's comments retained the protections of the Act. Slater made his comments in an employee meeting, in the transportation breakroom. <u>Datwyler Rubber & Plastics, Inc.</u>, 350 NLRB 669, 670 (2007)(breakroom meeting location weighed in favor of protection). Although there were other employees present, they were there to attend the meeting and Slater's comments therefore did not entail the risk of disrupting CTA's business. <u>Datwyler Rubber & Plastics, Inc.</u>, 350 NLRB at 670.

The Respondent contends that Slater did disrupt CTA's business by interrupting a presentation on safety, but there is no merit to this claim. First, although the meeting was to some extent related to CTA's business—as is any work meeting—employees at the meeting were not engaged in driving buses, or otherwise furthering the CTA's primary function of providing public transportation. Second, Slater did not in fact interrupt the safety presentation and instead reserved his comments until the Respondent opened the floor to questions, at which point the Respondent expected feedback and dialogue. <u>Id.</u> (place of discussion weighed in favor of protection where it occurred during employee meeting where employees were "free to raise workplace issues").

---

[30] The Illinois Labor Relations Board has considered these factors though it has not expressly listed them. <u>See</u> <u>Chicago Transit Auth.</u>, 30 PERI 9.

23

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000029

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000030

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 30 of 53 PageID #:58

Second, the subject matter of the discussion likewise weighs in favor of protection. Slater sought to speak on safety issues, which are matters of fundamental concern to employees. Lou's Transp., Inc., 361 NLRB No. 158 ("complaints about…serious perceived workplace safety hazards are a fundamental matter of concern to employees"). The Respondent contends that Slater did not sufficiently articulate his position or advocate for change, but to the extent that is true, it is because Williams immediately interrupted him and threatened to discipline him if he continued. The Respondent also suggests that Slater's comments were off topic, but two bargaining unit members, who have no stake in this case, confirmed that Slater asked questions and made comments about employee safety. These witnesses are inherently credible on this issue because they testified adversely to their current employer. In Re Caval Tool Div., 331 NLRB 858, 862 (2000).

Third, the nature of Slater's outburst also weighs in favor of protection because it was mild. Slater simply raised his voice and began moving to the front of the room. He did not use profanity and he did not otherwise insult a manager. Noble Metal Processing, 346 NLRB 795, 800 (2006) (affirming finding that lack of profanity favors protection); Goya Foods, Inc. & Dewys Taveras, 356 NLRB 476, 478 (2011) ("speaking loudly does not, by itself result in a loss of protection."). Slater's movement towards the front of the room does not demonstrate that he engaged in threatening conduct where the content of his speech was measured and where he did not make any threatening gestures. In Re Kiewit Power Constructors Co., 355 NLRB 708, 710 (2010) (a purported physical threat must be unambiguous to fall outside the protections of the Act). At most, Slater engaged in behavior that may be characterized as rude or defiant, when he kept speaking after Williams, a supervisor, interrupted him and instructed him to stop, but such behavior does not lose the protections of the Act. Goya Foods, Inc., 356 NLRB at 478. Indeed, he ultimately followed the General Manager's directive. Id. (employee who initially resisted directive but later complied was not engaged in insubordination that lost protections of the Act).

The only factor that weighs against protection is the last one because Slater's decision to speak at the meeting was not provoked by any unfair labor practice committed by the Respondent.

Nevertheless, the initial three factors justify the finding that Slater's conduct warrants the continued protections of the Act, even in the absence of employer provocation. Noble Metal Processing, Inc., 346 NLRB at 795 fn. 2 (finding employee's activity protected where first three factors were met even though there was no employer provocation).

24

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000031

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 31 of 53 PageID #:59

Thus, the Respondent violated Section 10(a)(1) of the Act when General Manager Williams threatened Slater with discipline when he spoke out about safety issues at an employee meeting.

2.  Respondent's Removal of the Union Office, 10(a)(1)

The Respondent violated Section 10(a)(1) of the Act when it ordered Slater to vacate the space that it the Union had used as an office for the preceding six months.   Slater satisfied his prima facie burden to prove that the Respondent thereby retaliated against him for engaging in protected activity, and the Respondent has failed to present a legitimate business explanation for taking such action.

The Board has not previously determined which legal framework should apply to an employer's allegedly retaliatory removal of a union's office.  However, one non-precedential ALJ decision suggests such a case should be analyzed under the Section 10(a)(2)-type framework, set forth above, and that analysis follows.   See Ill. Dep't of Cent. Mgmt Serv., 17 PERI ¶ 2014 (IL LRB-SP ALJ 2001).

First, Slater engaged in protected activity when he obtained the position of Union Executive Board member on January 27, 2015, and was sworn in as such on March 10, 2015.  In addition, Slater engaged in protected, concerted activity when he spoke out at the March 7, 2015 rap session on safety issues, as discussed above.   Slater again engaged in protected concerted activity when he resumed his union duties on April 6, 2015, after the Union President suspended his duties on March 19, 2015.

Second, there is no question that the Respondent knew of Slater's protected activity. General Manager Williams knew Slater was an executive Board member shortly after the membership elected him because she showed him the Union office at around that time.  Moreover, both Hernandez and General Manager Williams were present when Slater spoke up at the March 7, 2015 rap session.  Finally, Hernandez viewed Slater occupying the Union office, and spoke to him as a Union agent, when he informed the Slater that the Union needed to vacate the space.

Third, the Respondent took an adverse employment action against Slater when it eliminated the Union office.  The Board has not previously determined whether an employer's removal of the Union office constitutes an adverse action.  However, in one case a Board ALJ implicitly found

25

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000032

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 32 of 53 PageID #:60

that an employer's relocation of a union office does constitute an adverse employment action.[31]
Dep't of Cent. Mgmt Serv., 17 PERI ¶ 2014. By extension, an employer's complete removal of
the Union office, at issue here, is likewise an adverse employment action.

The Respondent contends that Slater has not demonstrated that he himself experienced any
qualitative change in his terms and conditions of employment, but his testimony concerning the
action's impact on others, reasonably demonstrates that the action had an impact on him too.
Slater need only demonstrate some qualitative change in terms and conditions of employment, and
the Board has previously held that an employer effects such a change when it eliminates a union's
access to its office. Chicago Transit Authority, 30 PERI ¶ 9 (IL LRB-LP 2013). Such removal
of a union's office impairs employees' ability to confidentially communicate with their bargaining
representative concerning the terms and conditions of their employment. Chicago Transit
Authority, 30 PERI ¶ 9. Indeed, it is evident that the Respondent's removal of the Union office
in this case did in fact impair employees' ability to communicate confidentially with the Union.
Slater testified that the CTA's removal of the Union office made it more difficult for him to discuss
private work-related disciplinary, medical, or family issues with the Union's membership.
Steward Morman also noted that there were times, after the Respondent removed the Union's
office, when he wished to have confidential union discussions, but could not do so. By extension,
Slater himself would necessarily have more difficulty speaking with a union steward who might
represent him in a disciplinary matter.

Fourth, Slater demonstrated that the Respondent acted in retaliation for Slater's protected
activity when it removed the Union's office because the timing of the Respondent's decision is
suspect, and the Respondent offered shifting reasons for its decision. First, the timing is suspect
because the Respondent decided to remove the Union's office just one month after Slater's most
recent, vocal instance of protected activity, his attempt to raise safety issues with management at
the March 7, 2015 rap session. In addition, the Respondent made its decision "almost
immediately" following Slater's return to Executive Board member duties on April 6, 2015. Vill.
of Calumet Park, 23 PERI ¶108 (IL LRB-SP 2007) (three weeks found suspicious); Sarah P.
Culbertson Memorial Hosp., 25 PERI ¶11 (IL LRB-SP 2009) ("few weeks" found suspicious).

---

[31] The ALJ in that case did not discuss this issue extensively and instead dismissed the Section 10(a)(1)
allegation, finding that the respondent had a legitimate business reason for its actions and did not move the
office in response to any protected, concerted activity by employees.

26

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000032

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000033

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 33 of 53 PageID #:61

Next, the Respondent offered shifting reasons for removing the Union's office. Hernandez told Union Steward Morman that the Respondent needed the office space to move the "safety guys from the back to the front." Hernandez thereby suggested that the Respondent wished relocate individuals who were already based at the North Park Garage, and not to provide space for the facilities maintenance manager, who was then located elsewhere. Hernandez later claimed that that the Respondent needed the space for the facilities maintenance manager, whose office was then located on the City's west side.

Accordingly, Slater has established that the Respondent eliminated the Union office at least in part because of his protected activity, and the Respondent must therefore demonstrate that it had a legitimate reason to eliminate the union office, on which it relied. City of Burbank, 128 Ill. 2d at 346. If that reason is pretextual, then the Respondent violated the Act. However, if the Respondent did rely on the reason, at least in part, then the case is one of dual motive. Id. In such dual motive cases, the Respondent must demonstrate, by a preponderance of the evidence, that it would have taken the adverse employment action, even if the Charging Party had not engaged in protected activity. Id.

However, the Respondent has not offered a legitimate business reason for removing the Union office. The Respondent's claimed need to make room for the facilities maintenance manager's office is not a reason upon which the Respondent relied at the time it evicted the Union from its space. Rather, the evidence strongly demonstrates that the Respondent seized on the facilities maintenance manager's early request for office space to disguise its true retaliatory motive for removing the Union's access to its office. The close proximity between Slater's protected activity and the removal of the Union's office—one month after he spoke out at the March 7, 2015 meeting and mere days after he resumed his Executive Board member duties—is strong evidence of retaliatory motive where Respondent did not explain its significantly delayed response to the facilities manager's request for office space. See County of DuPage and DuPage County Sheriff, 30 PERI ¶ 115 (IL LRB-SP 2013). Specifically, the Respondent has not explained why it waited until April 2015 to provide the facilities maintenance manager with space at North Park Garage, even though he asked for space months earlier (i.e., "early 2015"). Conversely, the Respondent has not explained its rush to provide the facilities maintenance manager with the space formerly occupied by the union, so soon after Slater engaged in protected activity when there was no pressing need for the office before. County of DuPage and DuPage County Sheriff, 30 PERI

27

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000034

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 34 of 53 PageID #:62

¶ 115 (reason for adverse action found pretextual where the Respondent did not explain its delay to take action against employee misconduct and where employee's protected activity intervened between his alleged misconduct and the date of the adverse action).

The fact that the Respondent ultimately provided the Union's space to the facilities maintenance manager does not demonstrate that his need for the space spurred the Respondent's decision to remove the Union from its office. To the contrary, the facilities maintenance manager's needs did not spring to Hernandez's mind when he told Morman why the Union needed to vacate the space. Instead, he told Morman that the office would go to "safety guys" already located at North Park Garage, and that the Respondent was simply moving them from "the back to the front." Under these circumstances, the Respondent's later reliance on the facilities maintenance manager's need for the office was simply a post hoc justification, intended to mask the Respondent's true motives. Accordingly, the Respondent has failed to rebut the Charging Party's prima facie case.

Thus, the Respondent violated Section 10(a)(1) of the Act when it removed the Union from its office.

### 3. Respondent's Removal of Union Flyers, 10(a)(1)

The Respondent did not violate Section 10(a)(1) of the Act when it removed Union flyers from the walls in June 2015. However, it applied its posting policy in a discriminatory manner by limiting Union postings to the Union bulletin Board and barring them from other areas specifically designated for personal and commercial postings.

"Rulings of the [National Labor Relations Board and the federal courts[,] when these bodies construe the [NLRA][,] are persuasive authority for similar provisions in the [Act]." American Federation of State, County and Municipal Employees v. Illinois State Labor Relations Board, 190 Ill. App. 3d 259, 264 (1st Dist. 1989); State of Illinois, Departments of Central Management Services and Corrections., 25 PERI ¶ 12 (IL LRB-SP 2009). Sections 6 and 10(a)(1) of the Act are analogous, respectively, to Sections 7 and 8(a)(1) of the National Labor Relations Act (NLRA). Accordingly, the NLRB's decisions addressing Section 8(a)(1) of the NLRA are persuasive authority in analyzing situations arising under Section 10(a)(1) of the Act.

An employer has a property right to "regulate and restrict employee use of company property." Soaring Eagle Casino & Resort, 359 NLRB 740, 747 (2013), vacated (2014), aff'd, 361

28

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000034

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000035

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 35 of 53 PageID #:63

NLRB No. 73 (2014), aff'd sub nom. Soaring Eagle Casino & Resort v. N.L.R.B., 791 F.3d 648 (6th Cir. 2015) (citing, Union Carbide Corp. v. NLRB, 714 F.2d 657, 663-664 (6th Cir. 1983) and Eaton Technologies, 322 NLRB 848, 853 (1997)). Employers generally may restrict employee use of company property, but may not promulgate or enforce these restrictions in a discriminatory manner. Container Corp. of America, 244 NLRB 318 (1979); Allied Stores Corp., 308 NLRB 184 (1992).

The NLRB has applied these principles to employer bulletin boards, holding that there is no statutory right of employees or a union to use an employer's bulletin board. Eaton Technologies, 322 NLRB 848, 853 (1997); Honeywell, Inc., 262 NLRB 1402, 1402-3 (1982) enfd. 722 F.2d 405 (8th Cir. 1983). Yet, "where an employer permits its employees to utilize its bulletin boards for the posting of notices relating to personal items such as social or religious affairs, sales of personal property, cards, thank you notes, articles, and cartoons, commercial notices and advertisements, or, in general, any non[-]work[-] related matters, it may not validly discriminate against notices of union meetings which employees also posted." Honeywell, Inc., 262 NLRB 1402 (1982) (internal quotes omitted. When an "employer permits, by formal rule or otherwise, employees and a union to post personal and official union notices on its bulletin boards, the employees' and union's right to use the bulletin board receives the protection of the Act to the extent that the employer may not remove notices, or discriminate against an employee who posts notices, which meet the employer's rule or standard but which the employer finds distasteful." Container Corporation of America, 244 NLRB 318, fn. 2. An employer's motive in such cases is irrelevant, "no matter how well meant." Honeywell, Inc., 262 NLRB at 1402.

Here, the CTA did not violate the Act by removing Union postings from the walls because the CTA uniformly removed all postings from the walls/doors/windows and established designated posting locations instead. Naranjo testified that he implemented and applied a posting policy in June 2015, when he became Senior Manager at North Park Garage, which barred employees from posting on windows, doors, and walls. He also designated specific areas for different types of postings. Naranjo removed the Union's postings from the doors and bathroom walls in accordance with that policy. Although postings still sometimes appeared in non-designated areas, the CTA removed them swiftly and their presence does not undermine the finding that the CTA applied its stated policy. Naranjo's testimony makes clear that the Respondent no longer tolerates such postings and removes them shortly after they appear on the walls and doors.

29

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000036

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 36 of 53 PageID #:64

Nevertheless, the policy itself was, in part, unlawfully applied because the CTA designated spots for personal and commercial postings, but did not allow union postings at those same locations. Dear-Townsend credibly testified that personal and commercial flyers remained posted at North Park garage after CTA began enforcing the policy. The CTA simply grouped those postings and designated an area in which employees could post them.[32] This designated area was not the Union bulletin board because Dear Townsend's testimony strongly suggests that the designated area spot for commercial and personal postings was accessible to employees, whereas the Union board was kept locked by the Union. Furthermore, all CTA witnesses affirmed that Union matters were confined to the Union bulletin Board. Thus, the CTA necessarily excluded Union postings from the areas designated by the CTA for commercial and personal postings.

The CTA's conduct, relegating Union postings to the Union board while allowing personal and commercial postings in a different designated space, is unlawful irrespective of the CTA's motives. If an employer allows employees space or furnishes space to post items of interest, as the CTA did here, it may not impose content-based restrictions that discriminate between posting of Union-related matters and other postings. Vons Grocery Co., 320 NLRB 53, 55 (1995); Amelio's, 301 NLRB 182 (1991); and Central Vermont Hospital, 288 NLRB 514 (1988).

Moreover, the CTA's prohibition against Union postings in areas separately designated for commercial and personal flyers violates the Act, even though CTA provide a bulletin board for the Union's exclusive use. Vons Grocery Co., 320 NLRB 53, 54-5 (1995) (existence of separate union bulletin board was irrelevant where employer restricted union postings on employee board designated for personal matters).

The CTA's posting policy is distinguishable from the one found lawful in Guardian Industries Cor., v. NLRB,[33] cited by the Respondent on brief. There, the Employer had opened its company bulletin board solely to small for-sale signs, and its refusal to post notices of union meetings did not constitute discrimination because it did not allow the posting of any meeting announcements. Here, by contrast, the CTA has established no content restrictions on postings

---

[32] Tellingly, no CTA witness denied Dear-Townsend's claim the CTA still allowed personal and commercial postings in a certain designated area. Indeed, the email policy that Naranjo relied upon in removing postings contemplated the designation of areas for posting personal matters because it referenced "party reminders," as a type of paper signage that should be posted only on designated bulletin boards, and distinguished such reminders from notices advertising "department events."

[33] Guardian Industries Cor., v. NLRB, 49 F.3d 317 (7th Cir. 1995).

30

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000037

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 37 of 53 PageID #:65

placed in the space designated for personal and commercial flyers other than its restriction on union-related postings. Cf. Guardian Industries Cor., v. NLRB, 49 F.3d 317 (7th Cir. 1995).

Thus, the CTA violated Section 10(a)(1) of the Act when it prohibited the posting of Union flyers in areas designated for commercial and personal flyers. However, it did not violate Section 10(a)(1) of the Act by removing Union postings from the bathroom and the south walls because it non-discriminatorily barred and removed all material posted to those areas.

4. Respondent's Alleged Postponement of Hearings on Slater's Grievances, and All Grievance Hearings at Which Slater Represented Union Members, 10(a)(1)

The Respondent did not violate Section 10(a)(1) of the Act by postponing hearings on Slater's grievances or on all hearings at which Slater represented union members because Slater has not proven that the Respondent engaged in such conduct. Slater presented insufficient evidence that the Respondent postponed hearings on any of his own grievances, as alleged in the complaint. He similarly presented insufficient evidence that the Respondent postponed each and every grievance hearing at which Slater represented union members, as likewise alleged in the complaint. Naranjo credibly testified that the Respondent only postponed one grievance hearing, that of bus operator Tidwell, and Slater offered no testimony to the contrary. In fact, Slater does not argue on brief that the Respondent postponed his own grievances or that it postponed all grievances at which Slater represented union members.

Turning to the evidence presented, there is insufficient basis on which to find that the Respondent violated Section 10(a)(1) of the Act by postponing Tidwell's grievance hearing. Slater contends that the Respondent thereby undermined him and the Union in the eyes of the membership, but the Respondent's conduct did not reasonably have such an impact.

An employer's disparaging remarks about a union agent's honesty and competence can interfere with, restrain, and coerce employees in the exercise of employees' protected activity, when made in the context of other coercive statements, especially those that convey to employees the futility of their efforts to have the union as their collective-bargaining representative. Future Ambulette, 293 NLRB 884 (1989), enfd. 903 F.3d 140 (2d Cir. 1990); cf. Sears, Roebuck and Co., 305 NLRB 193 (1991) (disparaging statements standing alone do not interfere with, restrain,

31

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000038

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 38 of 53 PageID #:66

or coerce employees' in the exercise of protected activity).[34]  Similarly, an employer violates section 10(a)(1) of the Act when it seizes upon an incident as a pretext to disparage and undermine the Union in the eyes of employees.  Hth Corp., 361 NLRB No. 65 (2014) (applying rationale to alleged violation of Section 8(a)(1) of the National Labor Relations Act, which is analogous to Section 10(a)(1) of the IPLRA), enforcement granted in part, denied in part sub nom. HTH Corp. v. N.L.R.B., 823 F.3d 668 (D.C. Cir. 2016).

However, it is difficult to find that Naranjo undermined the union in the eyes of employees when he postponed Tidwell's hearing because CTA promptly rescheduled the hearing, with the Union's consent, and thereby demonstrated the union's efficacy.

Moreover, Naranjo did not seize on the incident with Slater as a pretext to undermine Slater, a vocal union supporter.  Rather, Naranjo had a good faith belief that Slater was acting in contravention of CTA policy by recording or transmitting the hearing to a third party.  Naranjo heard a voice emanating from Slater's phone during the hearing, but Slater never announced that he would be on the line with a third party.  Although Slater denied that he was recording the hearing, Naranjo justifiably disbelieved him.  He had heard rumors that Slater liked to record members of management, and testimony from both Slater and other members of management confirms the existence of these rumors.  Slater admitted that several CTA managers had instructed him not to record them during disciplinary hearings, and both Transportation Manager Berry and Acting General Manager Hernandez stated that they believed Slater had attempted to record them. Arguably, Naranjo could have instructed Slater to turn off his phone and could have then continued the meeting, but his failure to do so is reasonably justified by the disturbance and the loss of trust that the incident engendered.

In addition, Naranjo's failure to take this more moderate action does not warrant a finding of unlawful conduct where Naranjo's decision to postpone the hearing was an isolated incident. Indeed, Slater represented employees at 20 different grievance hearings where Naranjo served as the CTA counterpart, and all but one proceeded without incident.  Thus, Naranjo's cancellation of

---

[34] This case overruled Future Ambulette, 293 NLRB 884, cited supra, to the extent that it "suggests that a violation of Sec. 8(a)(1) may he predicated on disparaging remarks alone."  Sears, Roebuck & Co., 305 NLRB 193, 194 n. 5. (1991).

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000039

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 39 of 53 PageID #:67

a single hearing does not have a reasonable tendency to undermine employees' faith in the Union or Slater, more particularly.

In sum, the Respondent did not violate Section 10(a)(1) of the Act by postponing hearings on Slater's grievances, postponing all grievance hearings at which Slater represented union members, or postponing bus operator Tidwell's grievance.

5.   Naranjo's Threat to Slater Related to Slater's Use of the Copier, 10(a)(1)

The Respondent did not violate Section 10(a)(1) of the Act when Naranjo threatened Slater with discipline for insubordination when he failed to follow Naranjo's directive to leave the copier area, after attempting to make hundreds of copies on the Respondent's copy machine.

As a preliminary matter, Slater was not engaged in protected, concerted activity when he was using the copier on the date Naranjo issued him the directive to leave the copier area.  The Board typically takes a "broad view of what constitutes protected activity within the meaning of the Act," but the Board also acknowledges that there are "limits to even that broad view," in cases involving an employer's property rights.  Vill. of Hazel Crest, 30 PERI ¶ 72 (IL LRB-SP 2013). In such cases, the Board balances the right of employees to engage in protected, concerted activity, with the Employer's property rights, and it has relied on federal sector case law in finding the correct balance.  Vill. of Hazel Crest, 30 PERI ¶ 72 (considering whether employees had a right to hang union banners on fire house and union decals on fire trucks).  Accordingly, NLRB case law is instructive here, and is considered below.

An employer has the "basic right to regulate and restrict employee use of [its] property," and this right extends to the employer's copy machines.  Champion International Corp., 303 NLRB 102, 109 (1991).  Nevertheless, an employer cannot apply its rules discriminatorily, by invoking them to restrict union activity, while freely permitting use of its property for non-business related reasons.  Champion International Corp., 303 NLRB at 109 (citing Union Carbide Corp. v. NLRB, 714 F.2d 657 (6th Cir. 1983).

Applying these principles, Slater was not engaged in protected activity when he attempted to make over 100 copies on the Respondent's copy machine, even if those copies were related to union matters, because the Respondent does not permit such excessive use of the copier by any employee for any reason.  Although the Respondent has a past practice of permitting the Union to make limited use of its copier for union matters, it does not allow the Union to make more than a

33

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000040

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 40 of 53 PageID #:68

hundred copies. The existence of this unwritten limitation is clear. Bus operator and union steward Morman testified that he knew of it. Transportation Manager Berry stated that he once informed Slater that he could not make more than 100 copies on the CTA's machine.[35] Naranjo himself indicated to Slater that he could make a limited number copies, but that his attempt to make hundreds, at issue in this case, was an "abus[e]… of the privilege." Indeed, there is no evidence in the record that the Respondent has ever allowed the Union to have unlimited use of the Respondent's copier. In addition, there is also no evidence that the Respondent allows employees to make any personal copies using the Respondent's copier, let alone over 100 copies of personal documents. Cf. Champion International Corp., 303 NLRB at 109 (employer that had a practice of allowing personal use of copier could not rely on its rule restricting employee use of copier to justify discipline of employee who copied union material).

Turning to the allegation at issue, Naranjo's threat that Slater would be subject to discipline if he did not leave the copy area does not interfere with, restrain, or coerce a reasonable employee in the exercise of protected rights. A reasonable employee would not view the threat as an attempt to prohibit the use of the Respondent's copier to duplicate union-related materials. Rather, a reasonable employee would view it as a directive to stop making excessive copies, which a reasonable employee would likewise know was not permitted.

Thus, the Respondent did not violate Section 10(a)(1) of the Act when Naranjo threated to discipline Slater for insubordination after their interaction by the copy machine.

6. Naranjo's Alleged Directive to Slater that he could have no Union Discussions on CTA Property Without Prior Approval of Management and Without a Manager Present, 10(a)(1)

The Respondent did not violate Section 10(a)(1) of the Act by informing Slater he could have no Union discussions on CTA property without prior approval of management and without a manager present because Slater has not proven that Naranjo made such statements. However, the Respondent did violate the Act by instructing Slater that he could not discuss the CTU strike on CTA property.

---

[35] It is unclear whether Berry informed Slater of this rule before or after Slater's incident with Naranjo, at issue here. However, the timing of Berry's directive is of little relevance where there is no evidence that the Respondent ever allowed the Union to make over 100 copies on its copier.

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000041

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 41 of 53 PageID #:69

An employer's no-solicitation rule on working time is presumptively valid in the absence of evidence that it was adopted or enforced in a discriminatory manner. Republic Aviation Corp. v. NLRB, 324 U.S. 793 (1945); Our Way, Inc., 268 NLRB 394, 402 (1983); Peyton Packing Co., 49 NLRB 828 (1943)). However, employees generally have a right to solicit on company property during their non-working time. Stoddard-Quirk Mfg. Co., 138 NLRB 615 (1962); Republic Aviation, 324 U.S. 793, 803 fn. 10 (1945); Peyton Packing Co., 49 828, 843-844 (1943), enfd, 142 F.2d 1009 (5th Cir.), cert. denied 323 U.S. 730 (1944).[36] Notably an employer's authority to enact rules against solicitation (oral communication) is narrower than its authority to enact rules against distribution (written communication) because the free time of employees on plant property is "the very time and place uniquely appropriate" for oral solicitation. Republic Aviation, 51 NLRB 1186, 1195 (1943), aff'd. Republic Aviation Corp. v. NLRB, 324 U.S. 793.

Nevertheless, an employer may restrict protected activity "if the employer demonstrates an overriding interest in prohibiting it." City of Evanston, 6 PERI ¶ 2034 (IL SLRB 1990) (citing Stoddard-Quirk Mfg. Co., 138 NLRB 615 (1962)). The employer may demonstrate an overriding interest if it can show that special circumstances make the restriction necessary to maintain production or discipline. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n. 10; Union Carbide Corp. v. N.L.R.B., 714 F.2d 657, 661 (6th Cir. 1983); Stoddard-Quirk Mfg. Co., 138 NLRB 615 (1962).

Turning to the allegations, Slater has not proven that Naranjo barred Slater's Union discussions on CTA property without prior approval of management and without a manager present, as alleged in the Complaint. Naranjo denied making such statements, and the testimony of bus operator Morman lends weight to his testimony. On cross examination, Morman stated that he did not remember Naranjo informing anyone on June 10, 2015, that no union discussions could take place on CTA property. Although Slater claims that Naranjo informed him that he could not have a union rap session without authorization from management and that he could not have a union rap session without a manager present, Morman's failure to recall any similar statement

---

[36] See also NLRB v. Pneu Electric, Inc., 309 F.3d 843 (5th Cir. 2002) (employer generally may not issue a blanket statement against solicitation by employees at a worksite, even during nonworking time); Our Way, Inc., 268 NLRB 394 (1983) (rules prohibiting union solicitation or activities during an employee's break times or other nonworking periods are overly broad and presumptively invalid because they could reasonably be construed as prohibiting solicitation at any time).

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000042

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 42 of 53 PageID #:70

undermines Slater's credibility on this point. Slater called Morman as his own witness and reasonably expected him provide testimony favorable to him.

Nevertheless, the Respondent did violate the Act by instructing Slater that he could not discuss the CTU strike on CTA property. The Respondent thereby prohibited activity protected under Section 6 of the Act and it has not proven that its restriction was necessary to "maintain production or discipline."

Section 6 of the Act protects "concerted activities not otherwise prohibited by law for the purposes of collective bargaining or other mutual aid or protection." 5 ILCS 315/6. Accordingly, to obtain the Act's protection, employee activity must be both concerted and protected. Cnty. of Cook (Cook Cnty. Hosp.), 10 PERI ¶ 3029 (IL LLRB 1994).

An individual engages in concerted activity when he invokes a right contained in a collective bargaining agreement. Pace West Division, 13 PERI ¶2027 (IL SLRB 1997). In cases that do not involve a right contained in a collective bargaining agreement, an employee engages in concerted activity when he or she acts **with or on the authority of** other employees, but not when the employee acts solely on his own behalf. Bd. of Educ. of Schaumburg Comm. Consolidated School Dist. 54, 247 Ill. App. 3d at 455 (addressing similar language under the Illinois Educational Labor Relations Act, 115 ILCS 5) (emphasis added); Pace West Division, 13 PERI ¶2027 (IL SLRB 1997). This concerted activity standard "encompasses those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." Id. (citing Meyers II, 281 N.L.R.B. at 887); see also Oak Brook Park District, 31 PERI ¶ 193 (IL LRB-SP 2015) (acknowledging that the Illinois labor Relations Board takes the same approach as the Illinois Education Labor Relation Board's approach, reviewed by the Court in Schaumburg supra).

Concerted activity is also protected if it is for the purpose of collective bargaining or for "other mutual aid or protection." County of Cook (Cook County Hosp.), 10 PERI ¶ 3029. Employees' concerted activity is protected under the "mutual aid or protection" clause even "when they seek to improve terms and conditions of employment or otherwise improve their lot as employees **through channels outside the immediate employee-employer relationship**." Eastex., Inc. v. NLRB, 437 US 556, 556 (1978) (emphasis added).

However, not all concerted activity is protected. Concerted activity that is too attenuated from "employees' interests as employees" will not be "deemed to come within the 'mutual aid or

36

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000043

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 43 of 53 PageID #:71

protection' clause." <u>Eastex., Inc.</u>, 437 US 556; <u>Board of Trustees of Southern Illinois University at Edwardsville</u>, 20 PERI ¶ 54 (IELRB 2004). In addition, concerted activity will lose the protections of the Act if it if the employee's "actions cross the lines of acceptability so that they can be characterized as 'disloyal' to the employer" or if "the manner in which the conduct …exercised renders the otherwise protected activity unprotected." <u>Chicago Transit Auth.</u>, 386 Ill. App. 3d at 573 (second quote); <u>County of Macon and Macon County Sheriff</u>, 8 PERI ¶ 2020 (IL SLRB 1992)(first quote).

Here, Slater's attempt to discuss the CTU with a group of employees on June 10, 2015 constituted concerted activity because he acted in his capacity as an Executive Board member of ATU to report on his union's activities at the CTU rally that took place the day before. <u>Department of Central Management Services (State Police)</u>, 30 PERI ¶ 70 (IL LRB-SP 2013) (union activity is concerted activity). In addition, he sought to garner additional support for the CTU, on behalf of his Union in furtherance of its well-publicized goals to help members of another public-sector union, the CTU.

Moreover, his discussions regarding the CTU were also protected because they were for the purpose of mutual aid and protection. The United States Supreme Court held that the phrase "mutual aid and protection" includes employees' "proper concerted activities in support of employees of employers other than their own." <u>Eastex, Inc.</u>, 437 U.S. 556 (1978)(relying on definition of "employee" in the National Labor Relations Act); <u>see</u> <u>Redwing Carriers, Inc.</u>, 137 NLRB 1545, 1546-1547 (1962), <u>enf'd sub nom.</u> <u>Teamsters v. NLRB</u>, 325 F.2d 1011 (1963), cert. denied, 377 U.S. 905 (1964) (employees engaged in protected concerted activity when they respected a picket line established another employer's employees) and <u>Gen. Elec. Co.</u>, 169 NLRB 1101 (1968)(employees engaged in protected activity when they solicited funds on behalf of agricultural laborers employed elsewhere), <u>enforced sub nom.</u> <u>N.L.R.B. v. Gen. Elec. Co.</u>, 411 F.2d 750 (9th Cir. 1969). Although the language of the Illinois Public Labor Relations Act (IPLRA) is not the same as the language of the NLRA, on which the Supreme Court in <u>Eastex Inc.</u> in part relied,[37] there is nothing in the IPLRA that expressly limits the phrase "mutual aid and protection" to concerted activities undertaken by employees of the same employer.

---

[37] The jurisdictions of the ILRB and the NLRB are different and these differences are reflected in the enabling statutes' definitions of "employee" and "public employee." <u>Compare</u> 5 ILCS 315/3(n) (definition of "public employee") and 29 U.S.C.A. § 152 (3) (definition of "employee").

37

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000044

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 44 of 53 PageID #:72

Accordingly, the Supreme Court's reasoning extends to this case, where one public-sector union encourages its members to show support for another public-sector union, and then keeps its members apprised of the other union's contract dispute. Indeed, the connection between ATU and the CTU is particularly close where the City's Mayor necessarily exercises his influence over the members of both unions. Accordingly, ATU's concern for the "plight of other employees," in this case CTU members engaged in a contract dispute with the City of Chicago, might help the ATU later gain support from the CTU when the ATU's members have a dispute with their employer, the Chicago Transit Authority, an arm of the same public entity. Eastex, Inc. v. NLRB, 437 U.S (affirming similar reasoning in finding certain political activity protected) (internal quotes omitted); see also Gen. Elec. Co., 169 NLRB 1101 (quoting Judge Learned Hand in N.L.R.B. v. Peter Cailler Kohler Swiss Chocolates Co., Inc., 130 F.2d 503, 505 (2nd Cir. 1942).

Notably, Slater's discussions about the CTU constituted protected activity even if some bus operators were not receptive to Slater's message. It is the content of the speech, not the way it is received by union members that establishes it protected nature. "When an individual employee solicits other employees to engage in group action, even where such solicitations are rejected, the inability to sway coworkers does not change the concerted nature of the activity." Detroit Legal News Co., 354 NLRB 283, 287 (2009) (citing Circle K Corp., 305 NLRB 932, 935 (1991)).

Moreover, Naranjo's directive was an unlawfully broad prohibition on union-related discussions, irrespective of his claim at hearing that he issued the directive to maintain driver and public safety. First, there is insufficient evidence that the drivers' state of mind in fact created an "unusual circumstance" that justified a restriction on employees' Section 6 rights. Naranjo admitted that he prohibited Slater's discussion preemptively, "before it got to that point" that the drivers' state of mind became a safety concern. Indeed, there is no indication that the Respondent had ever prohibited discussion of non-union-related subjects under similar circumstances, when management believed drivers would become too upset to drive safely if discussion continued. In Re Jensen Enterprises, Inc., 339 NLRB 877, 887 (2003) (counseling of employee for union discussion was not response to harassment complaint employer offered no evidence that it issued similar counseling where the subject of the complaint concerned something other than the Union).

38

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000045

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 45 of 53 PageID #:73

Second, the evidence indicates that Naranjo's concern that employees would forget their defensive driving skills was a post hoc justification for his directive, rather than a factor he relied upon. Naranjo did not offer this justification to Slater or to employees when he instructed Slater that he could not discuss the CTU on CTA property. The CTA did not offer this explanation in its answer and instead, appeared to justify Naranjo's conduct on the grounds that Slater's conduct was a violation of the CTA rule 14b, which prohibits employees from leading fellow employees into a wildcat strike, work slowdown, or other impermissible job action. The CTA stated, "[a]nswering further, CTA states the Charging party was informed that his actions were a violation of CTA Rule 14b." Although the CTA does not expressly state that the alleged rule violation justified Naranjo's statement, the CTA's reference to the rule must be construed as a defense to the Complaint because it would have no relevance otherwise. Permanent Label Corp., 248 NLRB 118. 130 and 142 n. 12 (1980), enforcement granted in part and remanded sub nom. N.L.R.B. v. Permanent Label Corp., 1981 WL 15486 (3d Cir. Jan. 8, 1981), on reargument, 657 F.2d 512 (3d Cir. 1981), and enforced sub nom. N.L.R.B. v. Permanent Label Corp., 657 F.2d 512 (3d Cir. 1981) (employer did not establish that its stated safety concern was in fact the basis for is prohibition on union solicitation where evidence indicated that employer did not rely on it).

Third, Naranjo's directive was overly broad even if the drivers' state of mind did raise safety concerns on June 10, 2015, as the CTA now claims. Naranjo prohibited all future discussions of CTU by Slater, on CTA property at all times, irrespective of how drivers may have reacted. Naranjo's directive had no time limit, no end date, and no exceptions for calm, measured, discussions about CTU that employees may have welcomed. Aroostook County Ophthalmology Center, 317 NLRB 218 (1995) (rule prohibiting discussion of grievances "within earshot of patients," with no limitations as to time or place, was an overly broad restriction on employees' statutory right to engage in protected concerted activity).

Notably, Naranjo's directive was unlawful even if Slater did not abide by it and later continued to speak to operators about CTU individually on CTA property because there is no requirement of proof that the employees were actually coerced in order to establish a violation of section 10(a)(1) of the Act. Vill. of Calumet Park, 23 PERI ¶ 108 (ILRB-SP 2007).

In sum, the CTA violated Section 10(a)(1) of the Act when Naranjo instructed Slater that he could not discuss the Chicago Teachers Union on CTA property. However, the CTA did not violate the Act by informing Slater stating that no union discussions could take place without

39

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000045

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000046

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 46 of 53 PageID #:74

management approval and without the presence of management because there is insufficient evidence that any CTA agent made such statements.

2. Section 10(a)(2) Allegations – Removal of Union Office, Removal of Union Flyers, Postponement of Grievance Hearings

The Respondent violated Section 10(a)(2) of the Act when it removed the Union office. However, the Respondent did not violate Section 10(a)(2) of the Act when it removed union flyers from the walls and postponed one grievance hearing at which Slater represented a unit member. The derivative Section 10(a)(1) allegation based on these latter claims is therefore also dismissed.

Section 10(a)(2) makes it an unfair labor practice for an employer "to discriminate in regard to hire or tenure of employment * * * in order to encourage or discourage membership in or other support for any labor organization." 5 ILCS 315/10(a)(2).

To establish a prima facie case that the employer violated Section 10(a)(2) of the Act, the charging party must prove by a preponderance of the evidence that: (1) that an employee engaged in union or protected, concerted activity, (2) the employer was aware of that activity, and (3) the employer took adverse action against the employee in whole or in part because of union animus or protected activity, with the intent to discourage or encourage union support. City of Burbank v. Ill. State Labor Rel. Bd., 128 Ill. 2d 335, 345 (1989); Sarah D. Culbertson Memorial Hospital, 21 PERI ¶ 6 (IL LRB-SP 2005); Macon Cnty. Highway Dept., 4 PERI ¶ 2018 (IL SLRB 1988); Macon Cnty. Highway Dept., 4 PERI ¶ 2018 (IL SLRB 1988). The charging party may demonstrate the employer's animus through circumstantial or direct evidence including expressions of hostility toward union activity, together with knowledge of the employee's union activities; timing; disparate treatment or targeting of union supporters; inconsistencies in the reasons offered by the employer for the adverse action; and shifting explanations for the adverse action. City of Burbank, 128 Ill. 2d at 345.

Once the charging party establishes a prima facie case, the employer can avoid a finding that it violated the Act by demonstrating that it would have taken the adverse action for a legitimate business reason, notwithstanding the employer's union animus. Id. Merely proffering a legitimate business reason for the adverse employment action does not end the inquiry, as it must be determined whether the proffered reason is bona fide or pretextual. Id. If the proffered reasons are merely litigation figments or were not in fact relied upon, then the employer's reasons are

40

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000047

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 47 of 53 PageID #:75

pretextual and the inquiry ends.  Id.  However, when legitimate reasons for the adverse employment action are advanced, and are found to be relied upon at least in part, then the case may be characterized as a "dual motive" case, and the employer must establish, by a preponderance of the evidence, that it would have taken the action notwithstanding the employee's union activity. Id.

      3.   Removal of the Union's Office, 10(a)(2)

The Respondent violated Section 10(a)(2) and (1) of the Act when it removed the Union's office.

As noted above, the analysis of this issue is substantially the same under Section 10(a)(2) as it is under Section 10(a)(1), analyzed above, except that the Charging Party must demonstrate that the Respondent took the complained-of action with the specific unlawful intent of discouraging union support.  Macon Cnty. Bd. and Macon Cnty. Highway Dep't, 4 PERI ¶ 2018 (IL SLRB 1988).  The Charging Party has satisfied that burden here.

Slater engaged in union activity when ran for Union office in later January 2015 and when the membership elected him in February 2015.  He also engaged in union activity when he spoke out at the March 7, 2015 rap session on safety issue because he identified himself as the Union's elected Executive Board member, when he spoke. As discussed above, Slater's protected, concerted activities at the rap session did not lose the protections of the Act.  See discussion supra. In addition, Slater again engaged in union activity when he resumed his union duties as Executive Board member on April 6, 2015, after the Union president had suspended them on March 19, 2015.

The Respondent's decision-makers, Williams and Hernandez, knew of Slater's union activities.  Williams knew that Slater won the election for the position of Executive Board member because she showed him the Union office shortly after he won.  In addition, Williams and Hernandez were both present at the March 7, 2015 meeting when Slater announced that he was the Union's elected Executive Board member.  Next, Hernandez reasonably knew that Slater had resumed his Executive Board member duties on or about April 6, 2015 when he told Slater to vacate the Union's office space.  Slater was using the Union's office at the time Hernandez conveyed his message.  In addition, Hernandez's directive to Slater, that the Union must vacate this space, indicates that he knew that Slater was then a union agent, authorized to act on the Union's behalf.

41

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000048

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 48 of 53 PageID #:76

As discussed above, the Respondent took adverse action against Slater when General Manager Williams, with Hernandez's input, decided to remove the Union's office.

Finally, the close proximity of the Respondent's adverse action to Slater's union activity, particularly his resumption of Union duties, combined with the Respondent's shifting and pretextual justifications for its action demonstrates that the Respondent removed the office to discourage support for the Union.[38] Chicago Transit Authority, 19 PERI ¶ 34 (IL LRB-LP 2003) (suspicious timing, shifting explanations, and pretextual reasons for adverse action evidence specific unlawful intent to retaliate against employee because of his union activity); Village of Summit, 20 PERI ¶ 27 (IL LRB-SP 2004) (ALJ noted that the circumstantial evidence, standing alone, would have supported his finding that the respondent violated Section 10(a)(2) of the Act, though he did also find direct evidence of union animus); cf. Macon Cnty. Bd. and Macon Cnty. Highway Dep't, 4 PERI ¶ 2018 (IL SLRB 1988) (close proximity of adverse action to union activity did not demonstrate unlawful motive where employer provided a legitimate business reason for its decision, and where union provided no other evidence of union animus).

Thus, the Respondent violated Section 10(a)(2) and (1) of the Act when it removed the Union's office.

### 4. Removal of Union Flyers and Postponement of Grievance Hearings

The Respondent did not violate Section 10(a)2) and (1) of the Act when the Respondent removed union flyers from the walls and postponed one unit member's grievance hearing.

As a threshold matter, the Respondent's removal of union flyers and postponement of another unit member's grievance hearing do not constitute adverse employment actions against Slater, and the Section 10(a)(2) allegations arising from this conduct therefore lack merit. An action need not have a tangible adverse result or adverse financial consequences to qualify as an adverse employment action that satisfies the third prong of the 10(a)(2) analysis. City of Chicago v. Ill. Local Labor Rel. Bd., 182 Ill. App. 3d 588, 594-95 (1st Dist. 1988). Nevertheless, while the definition of an adverse employment action is generous a charging party must show some

---

[38] The Charging Party asserts that the District Manager's statements about Slater's union campaign constitute direct evidence of union animus, but the District manager's statements are not relevant absent evidence that he took part in the decision to remove the Union's office, at issue here. See Macon Cnty. Bd. and Macon Cnty. Highway Dep't, 4 PERI ¶ 2018 (union animus must be imputed to the decision maker).

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000049

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 49 of 53 PageID #:77

qualitative change in his terms or conditions of employment or some sort of real harm. <u>City of Lake Forest</u>, 29 PERI ¶ 52 (IL LRB-SP 2012) (employee suffered no adverse employment action from negative comments made by management). Significantly, there can be no violation of Section 10(a)(2) of the Act absent evidence that the charging party suffered an adverse employment action. <u>Rockford Metro. Exposition Auditorium & Office Bldg. Auth. v. Illinois State Labor Relations Bd.</u>, 224 Ill. App. 3d 1007, 1016 (2d Dist. 1992).

The Respondent's removal of Union flyers from the garage walls does not qualify as an adverse employment action. There is no evidence in the record that the Respondent's removal of Union flyers made any change to Slater's terms and conditions of employment at all, and Slater raises no such argument on brief.

Next, the Respondent's postponement of another bus operator's grievance hearing had no impact on Slater's terms and conditions of employment, even though Slater served as that operator's union representative at the time. Although the Board has held that an employer's removal of significant responsibilities, coupled with a loss of prestige may constitute an adverse action, the Respondent's postponement of another employees' disciplinary hearing does not have the same impact. <u>Cf.</u> <u>County of DuPage and DuPage County Sheriff</u>, 30 PERI ¶ 115 (IL LRB-SP 2013) (employee suffered adverse action when employer removed him from special operations unit, which in addition to reducing his opportunity to earn overtime/comp time, also reduced his responsibility and caused a loss of prestige).

Thus, the Respondent did not violate Section 10(a)(2) and (1) of the Act when it removed union flyers from the walls and postponed one employee's grievance hearing, at which Slater represented the employee.

## V.      CONCLUSIONS OF LAW

1. The Respondent violated Section 10(a)(1) of the Act when it threatened the Charging Party with discipline on March 7, 2015 if he continued to speak at the rap session.

2. The Respondent violated Section 10(a)(1) of the Act when it limited Union postings to the Union bulletin Board while barring them from other areas specifically designated for personal and commercial postings.

3. The Respondent violated Section 10(a)(1) of the Act when it instructed Slater that he could not discuss the Chicago Teachers Union strike on CTA property.

43

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000050

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 50 of 53 PageID #:78

4. The Respondent violated Section 10(a)(1) of the Act when it removed the Union from the office it had occupied for several months.

5. The Respondent violated Section 10(a)(2) and (1) of the Act when it removed the Union from its office.

6. The Respondent did not violate Section 10(a)(1) of the Act when it removed Union flyers from the walls in June 2015.

7. The Respondent did not violate Section 10(a)(1) of the Act when it postponed a single grievance hearing at which Slater represented a union member.

8. The Respondent did not violate Section 10(a)(1) of the Act when it threated the Charging Party with insubordination if he did not leave the copy area.

9. The Respondent did not violate Section 10(a)(1) of the Act when it purportedly instructed the Charging Party that he could not have union discussions on CTA property without approval of management and without a manager present.

10. The Respondent did not violate Section 10(a)(1) of the Act when General Manager Elizabeth Williams purportedly contacted the Union President and stated that the Charging Party would be fired if he was not removed from his union duties.

11. The Respondent did not violate Section 10(a)(2) and (1) of the Act when it removed union flyers from the walls in June 2015.

12. The Respondent did not violate Section 10(a)(2) and (1) of the Act when it postponed one grievance hearing at which Slater represented a unit member.

## VI.    **RECOMMENDED ORDER**

IT IS HEREBY ORDERED that the Respondent, its officers and agents, shall:

1) Cease and desist from:

   a. Interfering with, restraining or coercing its employees in the exercise of the rights guaranteed them in the Act.

   b. Threatening the Charging Party for engaging in protected, concerted activity.

   c. Limiting Union postings to the Union bulletin Board while barring them from other areas specifically designated for personal and commercial postings.

   d. Instructing the Charging Party to not discuss the Chicago Teachers Union on CTA property.

44

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000051

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 51 of 53 PageID #:79

2) Take the following affirmative action necessary to effectuate the policies of the Act:

    a. Provide the Union with use of office space, on the same terms the Respondent initially provided it.[39]

    b. Post, at all places where notices to employees are normally posted, copies of the Notice attached to this document. Copies of this Notice shall be posted, after being duly signed, in conspicuous places, and be maintained for a period of 60 consecutive days. The Respondent will take reasonable efforts to ensure that the notices are not altered, defaced or covered by any other material.

    c. Notify the Board in writing, within 20 days from the date of this Decision, of the steps the Respondent has taken to comply with this order.

## VII.    EXCEPTIONS

Pursuant to Section 1200.135 of the Board's Rules, parties may file exceptions to the Administrative Law Judge's Recommended Decision and Order and briefs in support of those exceptions no later than 30 days after service of this Recommendation. Parties may file responses to exceptions and briefs in support of the responses no later than 15 days after service of the exceptions. In such responses, parties that have not previously filed exceptions may include cross-exceptions to any portion of the Administrative Law Judge's Recommendation. Within seven days from the filing of cross-exceptions, parties may file cross-responses to the cross-exceptions. Exceptions, responses, cross-exceptions and cross responses must be filed with the Board's General Counsel, at 160 North LaSalle Street, Suite S-400, Chicago, Illinois 60601-3103, or to the Board's designated email address for electronic filings, at ILRB.Filing@Illinois.gov. All filing

---

[39] The Respondent's ability to comply with this order is a matter for compliance proceedings. If the Respondent does not comply, the Charging Party can initiate compliance proceedings, and the Respondent will then have the opportunity to prove that compliance is impossible or unduly burdensome. First Transit/River Valley Metro, 26 PERI ¶ 38 (IL LRB-SP 2010) (any alleged difficulties that might arise in complying with ALJ's order, advanced by the respondent, could be considered in compliance proceedings) aff'd by unpub. ord., Docket No. 3-10-0435 (3d Dist. 2011); City of Markham, 28 PERI ¶ 124 (IL LRB-SP 2012) (employer raised impossibility of compliance in compliance proceedings); see also E.I. Du Pont De Nemours, 364 NLRB No. 113 n. 33 (2016)(allowing the respondent to litigate in compliance whether it would be impossible or unduly or unfairly burdensome to adhere to the NLRB's order).

45

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000052

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 52 of 53 PageID #:80

must be served on all other parties. Exceptions, responses, cross-exceptions and cross-responses will not be accepted at the Board's Springfield office. The exceptions and/or cross-exceptions sent to the Board must contain a statement of listing the other parties to the case and verifying that the exceptions and/or cross-exceptions have been provided to them. The exceptions and/or cross-exceptions will not be considered without this statement. If no exceptions have been filed within the 30-day period, the parties will be deemed to have waived their exceptions.

**Issued at Chicago, Illinois this 18th day of September, 2017**

**STATE OF ILLINOIS**
**ILLINOIS LABOR RELATIONS BOARD**
**LOCAL PANEL**

/S/ *Anna Hamburg-Gal*

**Anna Hamburg-Gal**
**Administrative Law Judge**

46

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 4 000053

Case: 1:20-cv-03356 Document #: 1-4 Filed: 06/08/20 Page 53 of 53 PageID #:81

# NOTICE TO EMPLOYEES

## FROM THE

## ILLINOIS LABOR RELATIONS BOARD

## Case No. L-CA-16-017

The Illinois Labor Relations Board, Local Panel, has found that the Chicago Transit Authority has violated the Illinois Public Labor Relations Act and has ordered us to post this Notice. We hereby notify you that the Illinois Public Labor Relations Act (Act) gives you, as an employee, these rights:

- To engage in self-organization
- To form, join or assist unions
- To bargain collectively through a representative of your own choosing
- To act together with other employees to bargain collectively or for other mutual aid and protection
- To refrain from these activities

Accordingly, we assure you that:

WE WILL cease and desist from interfering with, restraining or coercing our employees in the exercise of the rights guaranteed them in the Act.

WE WILL cease and desist from threatening the Charging Party, Erek Slater, for engaging in protected, concerted activity.

WE WILL cease and desist from limiting Union postings to the Union bulletin Board while barring them from other areas specifically designated for personal and commercial postings.

WE WILL cease and desist from instructing the Charging Party, Erek Slater, to not discuss the Chicago Teachers Union on CTA property.

WE WILL cease and desist from, in any like or related manner, interfering with, restraining or coercing our employees in the exercise of the rights guaranteed them in the Act.

WE WILL provide the Union with use of office space on the same terms we initially provided it.

DATE _____

_____
Chicago Transit Authority
(Employer)

## ILLINOIS LABOR RELATIONS BOARD

**One Natural Resources Way, First Floor**     **160 North LaSalle Street, Suite S-400**

**Springfield, Illinois 62702**     **Chicago, Illinois 60601-3103**

**(217) 785-3155**     **(312) 793-6400**

## THIS IS AN OFFICIAL GOVERNMENT NOTICE

## AND MUST NOT BE DEFACED.