IN THE MATTER OF THE ARBITRATION BETWEEN

CHICAGO TRANSIT AUTHORITY

And                                   Grievance Nos. 15-0634 and 16-0122
                                                    Discharge

AMALGAMATED TRANSIT UNION
LOCAL 241

DRAFT
OPINION AND AWARD

<u>Introduction</u>

      This arbitration involves two disciplinary grievances filed on behalf of Grievant Erek Slater. Grievance 15-0634 concerns Grievant's conduct following an accident on July 12, 2015. Grievant was charged with a behavioral violation, and discipline was accelerated to the second offense level, resulting in a corrective case interview, 6 months of probation, and a 3 day suspension. Grievance 16-0122 concerns Grievant's discharge for a second behavioral violation within 12 months as a result of events occurring on February 2, 2016. Grievance 15-0634 was tried on March 24, 2016. Grievance 16-0122 was tried on April 28, 2016. Mona Lawton and Piemengie Hamisu represented CTA in both cases, and David Lichtman and Ronald Willis presented the cases for the Union. Grievant was present throughout both days of hearing and testified in his own behalf. The parties agreed that there were no procedural arbitrability issues and that the cases were properly in arbitration. I will discuss the issue on the merits below. The proceedings were transcribed by a court reporter. Both sides filed post-hearing briefs.

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000002

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 2 of 35 PageID #:83

The parties' arbitration procedure calls for a three member panel. Ms. Lawton is CTA's Arbitrator and Mr. Lichtman is the Union's arbitrator. I am the Neutral Arbitrator. The parties stipulated that they were not waiving the tripartite procedure, and they reserved the right to an executive session if requested within ten days of my draft arbitration award.

1. <u>Grievance 15-0634</u>

Grievant was involved in an accident with another vehicle while driving his bus on July 12, 2015. The accident itself is not an issue in this arbitration and nothing said in this opinion should be understood as a comment on cause or fault. Operators who are involved in accidents are required to, among other things, report the accident to the control center. There is no dispute that Grievant called control shortly after the accident, and that a conversation ensued with Controller Eric Williams. The following transcript identifies the controller as CO and Grievant as GR:

CO: Control center. This is Williams.

GR: Yes. Control Williams. We've had a collision of vehicles.

CO: And what run are you?

GR: Four zero five.

CO: First time calling?

GR: I sent a message to the canned system, but, yes, first time calling from my cellphone.

CO Okay. What garage you out of?

GR: North Park.

CO And what is your run number?

GR: Four zero five.

CO: What happened?

2

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000003

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 3 of 35 PageID #:84

GR:     I'm not sure, but there was a collision of vehicles at Warren and Damen.

CO:     Where?

GR:     Warren and Damen.

CO:     There's no accident.  It's a blockage, right?

GR:     No there is an accident, a collision of vehicles, and there may be injuries.

CO:     But CTA is not involved?

GR:     No, CTA is involved.

CO:     CTA is involved?

GR:     That's correct.

CO:     And you the one involved?

GR:     That's correct.  This bus is.  We would like emergency facilities if they have not already been notified.

CO:     Are there any injuries?

GR:     I'm not sure, but it was a serious collision of vehicles.

CO:     Okay.  I need to worry about what's on the bus.  This is pertaining to CTA right now.  Was there any collision of the bus?

GR:     A vehicle and a bus made collision, yes.

CO:     Okay.  There aren't injuries on the bus, Badge 44560, correct?

GR:     Not that I know of.

CO:     Okay.  That's what I'm asking.  On the bus, first of all –

GR:     Mm-mm.

CO:     No injuries on the bus?  No one claims any injuries?

GR:     I've asked and no one has claimed any injuries. That's correct.

CO:     Okay.  Now my question is are there any injuries in the auto.

3

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000004

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 4 of 35 PageID #:85

GR:     I'm not sure.

CO:     Okay.  Not sure.

GR:     I'm not sure.

CO:     Okay.

GR:     I'm pretty sure an ambulance should be called as soon as possible.

CO:     Okay, do me a favor. Do me a favor. Do me a favor. Let me ask these questions because I don't want to get mixed up.  I know the direct question I want to ask in these regards.  Madison and Damen and you're standing.  Okay.  Dispatching.
How many passengers aboard the bus.

GR:     At the moment there is 5 plus myself.

CO:     5 passengers on the bus.

GR:     At the moment.

CO:     Jesus Christ.   Okay, can you give me a brief detail as to what happened?

GR:     I'd like to write my report but right now I just want to make sure that we get emergency …

CO:     Operator, do me a favor. When Power Control asks you some questions, please answer them, because I know what I'm doing on my end, doing my job. What I need to do is put details in this information.  What happened at that location?

GR:     It's not clear.  I -- I would like Union representation before I make any statement about --

CO:     Operator. I'm not a manager. I'm a controller. If you're unsure of what the duties of a controller are, I'll be glad to assist you so therefore we can all be on the same page. What happened at that location?

GR:     I would like to speak with an instruction – excuse me – a –

CO:     Operator

GR:      – manager.

4

CO:     Operator, I'm gonna ask you one more time, please. What happened at that location so the appropriate person can be informed to what happened. This is not an interview.

GR:     There was a collision of vehicles.

CO:     Collision of vehicles.  What happened?

GR:     At this point, I'm not ready to make a statement.

CO:     Okay sir.  At this point you're going to have a violation on top of an accident at this point.  I'm going to end this call here.  There is no injuries on the bus, correct?

GR:     How can this lead to disciplinary action?

CO:     There are no injuries on the bus, correct?

GR:     Not that I know of.

CO:     Okay.  Make sure you press your save event button.  The operator refused to give details as to what happened on the location.

GR:     The operator requested union representation.

CO:     Refused to give details about the scene of the accident.  Okay.  And once again gather as much information as possible.  I am Controller 29.  I'm going to get some assistance for you, okay?

GR:     Thank you Controller 29.

Williams, the controller, testified that he needed information about the accident so he could determine whether outside agencies were needed to provide assistance.  Williams said he could not get the information he needed and that he thought Grievant was holding back information.  He also said he was confused about the request for Union representation.

Immediately following his conversation with Grievant, Williams called Phillip Burch, a manager, and told him Grievant had refused to give details and had requested Union representation.  He also told Burch he was preparing a violation.  Williams prepared a document

5

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000006

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 6 of 35 PageID #:87

titled Controller's Report of Violation, dated July 12, 2015. He noted the type of violation as "Failure to follow instructions" and, under the remarks section, said:

> The operator was involved in an accident and failed to provide the necessary information that was requested by the controller in regards to the accident (who, what, when, and where). The operator was asked several times about what happened at the location, that caused the accident. The operator kept saying, 'I refuse to answer the question and would like to seek union representation.' I explain to him the importance on why I need the information to the question about the accident and the operator still refused to answer the question. The operator was informed that a violation would be prepared for failure to follow instructions.

Jairo Naranjo, Senior Manager, interviewed Grievant concerning the incident on July 16, 2015, and a report of the interview was prepared that same day. Grievant was advised that he was being given an accelerated behavioral violation, which would involve a corrective case interview (CCI), 6 months of probation, and a 3 day suspension. The Interview Record also says, "The employee was informed that another Behavioral violation in a twelve month period may result in recommendation for discharge." Grievant was given the same warning in his CCI, which occurred on July 16, 2015. The discipline was grieved on August 11, 2015.

On direct examination, Naranjo was asked what specific conduct violated CTA's rules and he responded that Grievant "gave misleading information in regards to the incident itself." As an example, Naranjo pointed to Grievant's assertion to Controller Williams that he did not know if there were any injuries, but then asked Williams to send an ambulance. Based on his own experience, Naranjo said he believed Grievant knew the extent of the incident and the extent of the injuries. Naranjo also cited Grievant's statement to Williams that he did not know what occurred even though he was involved in the accident. According to Naranjo, Grievant knew "everything that occurred at that site." Naranjo acknowledged that Grievant did not have any

6

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000007

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 7 of 35 PageID #:88

previous behavioral violations, but he said he thought Grievant's misleading report warranted accelerating the discipline to the second level.

Naranjo also found Grievant guilty of violating General Rule 14(d), insubordination, because he failed to give the information the controller asked for, which Naranjo said meant Grievant disobeyed a direct order. Grievant was also charged with a violation of General Rule 14(x), "Disrespect to supervisory personnel, co-workers, or the public," Naranjo said, because of "the way he just went around the controller's question." Also, "he failed to give the controller vital information on an incident that was deemed serious." The vital information, Naranjo testified, included Grievant's failure to tell the controller whether occupants of the car were injured. Naranjo said he looked at the video of the incident and Grievant "did nothing to get off that bus to see if there was any injuries in that auto." Grievant also did not tell the controller that the car was disabled. The Union played the video on cross examination to challenge Naranjo's credibility. It showed that Grievant looked outside the bus without leaving it on two occasions, and that on one occasion before he called Williams, Grievant exited the bus and walked to the car involved in the accident.

Naranjo said the conduct that warranted accelerated discipline for a behavioral violation was "making untrue, dishonest, or misleading report, falsification, insubordination, failing to obey a direct order from supervisory, managerial or executive personnel." This conduct is listed in the portion of CTA's Corrective Action Guidelines (CAG) as "examples of behavioral violations that may warrant accelerated discipline."

Grievant said that after the accident he asked his passengers if they were ok, and then moved the bus to the curb and asked them again. He then used an on-board system to send an automated ("canned") message to control saying that he had been in an accident. Grievant said

7

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000008

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 8 of 35 PageID #:89

he then went to check on the occupants in the car. He said he wasn't certain if they were injured, but he did not see anything that looked "life-threatening." However, "It looked like we should definitely have an ambulance soon in case there was any problem." Grievant said he did not know the extent of any injures and that the people in the car did not say anything to him. Grievant said he returned to the bus and distributed courtesy cards to his passengers, which was standard operating procedure.

Grievant testified that he asked for Union representation because he knew his conversation with control would be recorded and he was concerned that it could be used against him in a disciplinary hearing and cause him to get disciplined. He was also concerned, he said, because Naranjo had recently disciplined him for a miss when he was off on Union business and had said to him, "You know, Mr. Slater, if you don't have a job with CTA, you can't be an executive board member."[1] Grievant said he thought he had a target on his back. Union counsel referred Grievant to the report he made after the accident, which said six witnesses claimed the other car ran a red light and the bus could not have avoided the contact. Counsel asked Grievant why he did not give that information to the controller, but Grievant said the information came from the courtesy cards he handed out to the passengers right before he called control. Thus, he did not have that information when he spoke to the controller. Also, Grievant said he had observed the damage when he was off the bus, but he did not describe it to the controller because he did not specifically ask about it.

On cross examination, Grievant said he was not disciplined for the miss until July 16. However, on redirect he said the July 16 discipline concerned a July 9 miss, and that he spoke to Naranjo about the miss on the 9th. He said they also spoke about unfair labor practices Grievant

---

[1] There is apparently a grievance pending on that discipline, which is not part of this case.

8

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000009

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 9 of 35 PageID #:90

had filed naming Naranjo. Grievant said some of the comments about who was at fault in the accident may have come from people outside the bus. He also claimed to have answered every question Williams asked.


Positions of the Parties

CTA argues that Grievant repeatedly refused to truthfully and fully answer the controller's questions, and failed to provide the necessary information about the accident. The video shows that Grievant left the bus and walked to the other car, where he was able to see any damage and observe the passengers. CTA says Grievant checked to make sure the passengers in the car were all right, and he also looked at the damage to the bus. Grievant knew he was supposed to give this information to the controller, but he refused to do so, and continued his refusal even after getting a direct order to answer the questions. Discharge was the appropriate discipline, CTA contends, pointing out that Grievant could have been discharged because insubordination can result in discharge for a first offense. In addition, Grievant's responses to the controller's questions were misleading. CTA says the determination of the appropriate discipline is the proper function of management, and that I should not substitute my judgment for Naranjo's. CTA also asserts that the rules at issue were reasonable and it says Grievant was provided due process. CTA conducted a thorough investigation and Grievant was afforded Union representation and given a chance to tell his side of the story. CTA also says Grievant was treated fairly and that there were no mitigating factors that warranted imposing a lesser discipline.

The Union says CTA charged Grievant with multiple violations and that to sustain the discharge, it must prove that Grievant was guilty of all three, i.e., insubordination, falsification,

9

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000010

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 10 of 35 PageID #:91

and disrespect to co-workers. The Union argues that Grievant was not guilty of insubordination for several reasons. First, the controller was not a manager or supervisor. Moreover, he did not give Grievant a direct order or inform Grievant of the consequences of failing to obey an order. Nor, the Union says, did Grievant disobey any direct order. On cross examination, the controller testified that he wanted to obtain the who, where, what and when of the accident, but he also conceded that Grievant furnished that information. The Union contends that CTA's argument conflates two requirements in Rules 17(a) and (b) – first, that an employee involved in an accident notify control as soon as possible and, second, that on the same day the employee complete a written report. Nothing in Rule 17(b), the Union insists, required Grievant to provide a detailed verbal report.

The Union also argues that Grievant did not provide misleading information. Proof of that charge, the Union asserts, requires a showing of an intent to falsify or mislead, but there is no evidence of such intent in this case. Nor is there evidence, the Union says, that Grievant even knew the information Naranjo claimed was required. Naranjo asserted incorrectly that Grievant never left the bus, but he claimed that Grievant should have understood the extent of the injuries to the passengers in the other car. However, the Union says there is no proof that Grievant understood the extent of the injuries to passengers in the other car, and there is no evidence that they were even injured. The Union also contends that Grievant was not disrespectful of the controller. Finally, the Union argues that it was appropriate in the circumstances for Grievant to assert his *Weingarten* rights and ask for Union representation.

Findings and Discussion for Grievance 15-0634

10

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000011

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 11 of 35 PageID #:92

The parties' proposed statements of the issue used different terminology, but were substantially similar. After discussion, the parties agreed to the issue as I framed it at the hearing: Whether there was sufficient cause for discipline and whether the Employer properly accelerated the discipline. If not, what should the remedy be? The issue applies to the second level discipline administered on July 16, 2015. The sufficient cause for discharge issue applies to Grievance 16-0122.

CTA cited insubordination as one justification for discipline, and for its decision to accelerate the discipline. The CAG, under the heading "Behavioral Violations/Gross Misconduct," includes as an example of an infraction that can warrant accelerated discipline "Insubordination (failing to obey a direct order from supervisory, managerial or executive personnel)." CTA is bound by its own definition of insubordination, which clearly applies only to orders given by members of supervision or management, a status that did not include Controller Williams on July 12, 2015. Williams, in fact, told Grievant he was not a supervisor. Williams had the right to recommend discipline, which is one of the criteria sometimes used to determine supervisory status. But, CTA has not claimed in this arbitration that Controller Williams was a supervisor, manager, or executive. Thus, by CTA's own definition, Grievant was not guilty of insubordination.

The Company's principal remaining contention is its claim that Grievant was guilty of giving a misleading report because he failed to provide vital information to the controller. The same facts that apply to this charge also apply to CTA's claim that Grievant violated General Rule 14(x) because, according to Naranjo, Grievant was disrespectful to a coworker (Williams) by going around his question and failing to furnish vital information. The misrepresentation claim concerns an alleged violation of General Rule 14(j), "Falsifying any written or verbal

11

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000012

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 12 of 35 PageID #:93

statement." In addition, the CAG lists as an example of conduct that can warrant accelerated discipline "Making untrue, dishonest or misleading reports (falsification)." As the Union correctly points out, falsification is a form of dishonesty and, in order to prove that charge, an employer must show that an employee had an intent to deceive. Thus, CTA must prove that Grievant's report was false, that he knew it was false, and that he gave the report to deceive or mislead CTA concerning his conduct. CTA cannot carry this burden.

The principal problem for CTA is that it did not establish that Grievant's report to Williams was false. I acknowledge that CTA was somewhat handicapped in its proof because the controversy concerning the accident itself is covered by a separate grievance, and both sides objected to testimony concerning the circumstances of the accident during the hearing. I admitted some evidence about the accident, but I know very little about the force of the impact or the damage to the vehicles, and I know nothing about the seriousness of any injuries to passengers in the car. Nevertheless, I have to decide the case on the basis of the evidence in the record. Grievant told Williams there was an accident and where it occurred; he said the accident was serious; he reported that the accident was between an automobile and the bus Grievant was driving; he told Williams he had spoken to his passengers and no one on the bus claimed to be hurt; he said he was not sure whether anyone in the car was injured; and, in response to Williams' question about what happened, Grievant's initial response was "It's not clear."

On direct examination, Naranjo was asked to give an example of Grievant's "misleading information," and he said:

> He told the controller – the controller at one point asked him if there were any injuries in the auto. He says he did not know. However, his next statement right after that was, 'But I just think – just send an ambulance to the scene.' To me, in my opinion and my expertise and my knowledge of being here at the CTA being a bus operator, being a first responder and

12

> first CTA employee on the scene he knew to what extent the incident was
> and what extent the injuries were.

Still on direct examination, CTA counsel asked Naranjo about his belief that Grievant failed to

provide vital information to the controller and Naranjo responded, in part, that Grievant did not

get off his bus to see if anyone in the car had been injured.  On cross examination, Naranjo was

asked how Grievant could have known the extent of the injuries to passengers in the car if he did

not get off the bus and go to the car; Naranjo responded:

> I asked myself the same question because he told the controller that he is
> pretty sure that an ambulance was needed.  So, to me, that led me to believe
> that he knew some part of the injuries.  It may be the impact itself, maybe
> it was where the car ended up, maybe the amount of damage, I don't know.

When Naranjo decided that Grievant had misrepresented his knowledge about injuries to

passengers in the car, then, he apparently based his conclusions on the nature or force of the

impact.  As noted above, I do not know the force of the impact or the extent of the damage to the

car.  But even if I did, it is not clear to me that such information would be sufficient to prove that

Grievant must have known the passengers were injured or, at least, that he would have known

the extent of the injuries.

In fact, however, Grievant did get out of his bus and he walked to the car.  He testified

that no one in the car said anything to him and that there did not appear to be any life threatening

injuries.  However, he testified he was not sure whether the occupants were okay and that he

thought an ambulance should be called in case there were problems.  There is nothing in the

record questioning Grievant's account of these events (except Naranjo's erroneous belief that

Grievant did not leave the bus) and nothing that suggests Grievant falsely reported that he could

not tell whether the passengers were injured.  In fact, the only evidence in the record concerning

any injury to a passenger was Naranjo's testimony that people were transported from the scene.

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000014

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 14 of 35 PageID #:95

But that would not necessarily mean that Grievant understood from looking in the car that someone was seriously injured. Nor would transportation to a hospital of itself necessarily mean that injuries were serious, or that the extent or seriousness of the injuries could have been assessed by looking at the passengers through a car window. In these circumstances, I cannot conclude that Grievant knew the extent of the passengers' injuries, if any, and then lied about it during his report to Controller Williams. To the contrary, the record supports an inference that Grievant believed injuries were possible and he told the controller he should send an ambulance to the scene. This was not a misleading or false report. I do not mean to suggest that it was inappropriate for Williams to ask Grievant how the accident happened, but I do not understand how Grievant's failure to supply that information was dishonest or misleading.

CTA also says Grievant's report to the controller was misleading because he failed to convey "vital information." Part of the vital information Grievant allegedly withheld, Naranjo said, was whether passengers in the car were seriously injured. But, as discussed above, there is no proof that Grievant withheld any information about passenger injuries. Naranjo also said Grievant failed to tell Williams that the car was disabled and would need to be towed. But in order to convey that information, it would have to have been apparent to Grievant that the car was not in working condition. Naranjo testified that the car was towed from the scene, but he did not describe the damage, and there was no other evidence about the damage. I cannot conclude, then, that it would have or should have been apparent to Grievant that the car was no longer operable when he called central control. It is also worth noting that Williams did not ask Grievant about the condition of the car or the bus. Nothing in this analysis supports a conclusion that Grievant acted dishonestly by giving a misleading report. There is no question that Grievant

14

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000015

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 15 of 35 PageID #:96

would not answer William's question about how the accident happened, but that is not evidence of dishonesty. Grievant did not lie to Williams.

Naranjo said operators had been trained about the need to provide more information, and he cited SOP 70.21 as the appropriate protocol. But that document was not introduced into evidence and the record does not say whether it advises operators that they must describe an accident in detail upon their initial oral report to the control center. The only written requirements cited at the hearing were General Rules 17(a) and (b):

> (a) Complete and accurate written reports must be made for every accident ... which involves the CTA. These reports must be made on proper forms before completion of the day's work. Employees must not falsify any reports.

> (b) Employees must notify Operations *and* Communications/Power Control and their immediate supervisor as soon as possible in any case of an accident involving personal injury or serious property damage. (italics in original)

Grievant notified Williams of the accident as soon as possible after it occurred, first by sending the canned message, and then by telephone call. He did not advise Williams that there was a personal injury or serious property damage. But, as already discussed, there is no evidence that Grievant knew anyone was injured or about whether the extent of the property damage would have been apparent to Grievant.

Rule 17(a), not Rule 17(b), requires a "complete and accurate" *written report* of an accident. CTA has not charged Grievant with filing an incomplete written report. Rather, the charge is that Grievant failed to disclose vital information in his call to Controller Williams. But there is no evidence of any rule that compels operators to provide details about how the accident occurred in their initial oral report to the control center. As I understood the testimony of CTA's witnesses, the purpose of the report is so the controller can determine what kind of assistance or

15

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000016

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 16 of 35 PageID #:97

personnel to send to the scene, meaning police, ambulance, fire, supervisor, etc. Williams expressed this in his violation when he said Grievant "failed to provide the necessary information that was requested by the controller in regards to the accident (who, what, when, and where)." But Grievant gave Williams all of this information – he told him he had been in a serious accident with a car, where the accident occurred, and when it occurred. He also said no one on the bus claimed to be injured, and that he was not certain whether anyone in the car was injured, although he thought an ambulance should be sent to the scene.

Grievant did not describe the extent of the damage to the bus or the car, but he was not asked to do so because Williams terminated the interview when Grievant refused to describe how the accident occurred and asked for Union representation. I agree with Naranjo that the extent of the damage could have been vital information. It might have indicated the likelihood of injury to the passengers in the car or allowed Williams to make a more informed judgment about what kind of help was needed at the scene. There would have been no justification for refusing to furnish that information. But on this record, I cannot find that Grievant refused to supply it.

CTA also charged Grievant with several other rule violations. Grievant's conduct did not violate Rule 17(b), which does not, on its face, require that an employee involved in an accident provide an oral report to the controller about the details of how the accident occurred. Grievant was also charged with a violation of Rule 10(b), which deals with an obligation to submit to drug testing following an accident. There was no evidence about any drug testing, and Rule 10(b) does not address a requirement to furnish information. Rule 15(a) requires employees to "render all assistance possible" in the event of an accident. There was no evidence about how this rule has been applied. However, it appears to deal with providing assistance at the scene of the accident. Rule 15(d) deals with reporting the accident, and is essentially the same as Rule 17(b).

16

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000017

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 17 of 35 PageID #:98

Grievant did not violate Rule 15(a). Nor did he violate Rule 8, which appears to deal with conditions on a bus that imperil the safety of passengers. And, finally, Grievant did not violate Bus System Rule Book Rule B4.1, which requires him to devote full attention to his duties.

The rules Naranjo cited that perhaps could apply to Grievant's refusal to describe how the accident occurred include General Rule 14(e), which deals with conduct unbecoming an employee. The allegation of conduct unbecoming an employee is cited in many discipline and discharge cases and its scope is not clear. There is nothing in this record to suggest that Grievant's actions were indecent or inappropriate, unless appropriateness is judged by failure to adhere to rules. If that were the case, then the charge would depend on proof that Grievant violated another rule. Rule 24 deals with Use of Best Judgment. Again, this rule is often cited in discipline cases although, as in this case, it is typically not addressed separately. The rule appears to require an employee to act prudently in dealing with situations not covered by any rules and to then report his actions to supervision. As such, it does not apply to this case. More problematic are Rule 14(w), which forbids poor work performance, and Rule 7(a), which says "all rules, orders, bulletins and instructions must be obeyed."

Both rules require adherence to rules, policies, etc. Although Rule 7(a) mentions adhering to instructions, the instructions at issue here did not come from a supervisor. That means that Grievant can be disciplined for failing to comply with the controller's instructions only if he had some duty to comply. Similarly, Grievant cannot be guilty of poor work performance unless he was required to tell Williams how the accident occurred. But CTA has not cited any rule or policy that addresses an employee's obligation to describe in any detail how the accident occurred during his initial oral report to control central. Nor has CTA submitted convincing evidence that such information would be "vital" to CTA's initial response, which

17

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000018

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 18 of 35 PageID #:99

involves sending emergency personnel, police and supervision.  Certainly, at some point CTA has a right to question employees concerning the details of an accident and employees have an obligation to cooperate with the investigation, accompanied by Union representation, if *Weingarten* requirements were met.  But I am unable to find that Grievant violated any of the rules CTA cited when he failed to respond to Controller William's question about how the incident occurred.

Finally, although the matter is not without controversy, in the unique circumstances of this case, Grievant had a right to request Union representation before answering questions about how the accident occurred.  *Weingarten*, which has been applied to Illinois public employees, allows an employee to request Union representation in any investigatory interview that he reasonably believes could lead to disciplinary action.  The scope of *Weingarten* is limited, so that employees cannot use it to demand Union representation in routine meetings or conversations with supervisors, even if the conversation is intended to correct or criticize an employee's work.  The principal controversy in the instant case is that Grievant's conversation with Controller Williams was not an investigatory interview, and Williams was not a supervisor.  However, Grievant knew the conversation was recorded and could be made available to management.  That, of itself, might not be sufficient to invoke *Weingarten*.  But only three days before the incident at issue, Naranjo had disciplined Grievant and during that conversation told Grievant that he could not be a Union executive board member if he no longer worked for CTA.  Given this comment, it was not unreasonable for Grievant to believe on July 12 that his recorded conversation with Williams about how the accident occurred would become part of the investigation into whether he was at fault in the accident and whether his conduct warranted discipline.

18

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000019

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 19 of 35 PageID #:100

Once an employee requests Union representation, an employer can decline the request and terminate the interview, which is what happened here. The employer can also determine whether disciplinary action is warranted without conducting an interview with the employee. However, an employee cannot be terminated for refusing to answer a question to which *Weingarten* rights attach. In the instant case, then, Grievant had a right to request Union representation before he answered Williams' question about how the accident occurred, and CTA could not discipline him for failing to answer the question when the request was denied. It should be noted, however, that CTA did not ask the question in an interview with Grievant, but, rather, made the inquiry during an attempt to assess the seriousness of an accident and the type of response needed. Had CTA been able to demonstrate that it needed an immediate account of how the accident occurred in order to respond properly – which, as discussed above, it did not do – then the applicability of the *Weingarten* doctrine might legitimately be questioned.

Grievance 16-0122

As noted above, this grievance deals with an incident that occurred on February 2, 2016 at North Park Garage, for which Grievant was charged with another behavioral violation and discharged on February 9, 2016. The issue in this grievance is whether CTA had sufficient cause to discharge Grievant and, if not, what the remedy should be. At around 5:00 p.m. on February 2, 2016, a drug test technician brought Transportation Manager Andrew Berry a list of operators who had been selected for random drug testing by the Federal Transportation Administration. Four of the operators were working at that time, and three of them would be returning their bus to the garage at the end of the shift. The other operator would be relieved on a route and would take public transportation back to the garage. Berry said when employees finish their shift, they

19

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000020

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 20 of 35 PageID #:101

are required to go to the clerk's office and turn in their daily report. Berry testified that when the employees to be tested include a relief operator, he has to remain in the clerk's office until the relief operator arrives to turn in her daily report, and he then notifies her of the drug test. When employees return their buses to the garage, they go through an area called the vault island, where they stop while a box puller takes the cash box from the bus and empties it into a vault. Berry testified that it was common for him to have the box pullers tell returning operators to see him.

On February 2, 2016, Berry waited in the clerk's office for the relief operator and he prepared hand-written instructions for the box pullers telling them to notify the other three operators to see him. Berry said he gave the instructions to box puller Taylor, along with a copy that Taylor was to give to box puller Browning.[2] Berry did not tell the box pullers that the employees on the list had been selected for drug testing. Berry's instructions were relayed to operator B, one of the operators selected for drug testing, and he reported to Berry at the clerk's office window and asked why Berry wanted to see him.

Berry said that at around 7 p.m., Grievant approached him at the clerk's office window and said, "Since when do box pullers have to do the job of managers and supervisors?" Berry responded that he had the right to direct what his employees did. Grievant then left to go to the restroom. He returned a few minutes later and, according to Berry, said, "I am requesting that you cease and desist." Berry said he responded, "I'm not even going to entertain that," and Grievant then left the area. Meanwhile, Berry still had not heard from the two remaining operators on the list of employees to be tested. He said he saw one of them in the training room talking to other employees, and called him to the clerk's office via the PA. He gave the employee written notice of the drug test, and then asked if the box pullers had told him to see

---

[2] There was also another box puller who was not scheduled to report to work for about two hours. She apparently was not affected by the incident at issue in this case.

20

Berry; the operator said he did not hear anyone tell him to see Berry. Later, Berry saw the other

operator in the training room and used the PA to summon him as well. That operator, too, said

he had not heard anyone tell him to see Berry.

Berry said he talked to the box pullers and they told him they did not notify two of the

operators because Grievant told them they did not have to. Berry prepared a list of three

questions he gave to both box pullers, and instructed them to complete a Report to Manager

answering the questions. The three questions were "1) Were you aware of the three operators

who needed to see me; 2) Did any of them come through your vault island; 3) If you did not tell

them I need to know why." Box Puller Browning's report said:

1.  I was informed about the three operators management requested

2.  I did not know if any of those operators came through my lane

3.  I did not know who the operators were because [Grievant] removed
    the sheets from my work station.

Box Puller Taylor's report said:

> Manager Berry gave list of operators to see management to myself at
> vault[.] Speaking to union Rep. [Grievant, he] stated that we should not
> perform duties of management and supervision, after informing one of the
> operators.

Taylor's statement apparently means that by the time he spoke to Grievant, he or Browning had

already told one of the operators to see Berry.

Berry said it was not uncommon for him to use box pullers or other employees to inform

employees that Berry wanted to see them. He also said he had used this practice at other

garages. Berry noted that the job description for Cash Box Puller says the incumbent "works

under the supervision of the station superintendent," which on the evening of February 2, 2016,

would have been Berry. Berry said he does not use supervisors to notify employees selected for

21

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000021

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000022

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 22 of 35 PageID #:103

drug tests; those instances are handled either by box pullers or himself. He said it is important to notify employees of the drug test promptly because there are time limits about when they have to complete the test. Berry had video from Grievant's bus pulled and he sent the video and the box pullers' statements to Senior Manager Naranjo, accompanied by a memorandum describing the incident. Berry said he did not view the video.

Phillip Paige, Lead Transportation Manager at North Park Garage, was assigned by Naranjo to view the video Berry had secured, and Paige captured some still shots that showed Grievant standing in his bus, holding what appears to be a copy of the instructions Berry had written and given to the box pullers. Paige sent the still shots to Naranjo and subsequently conducted an investigatory interview with Grievant and his Union representatives on Tuesday, February 9. Paige said at the beginning of the meeting, Grievant asked that he dismiss the hearing, and questioned whether it was proper for a transportation manager to preside over a hearing involving an executive board member of the Local Union. Paige declined to dismiss the hearing. Paige said during the meeting he reviewed the facts as he understood them, including the still shots from the video. He also showed the video at Grievant's request. Grievant told Paige he did not take the written instructions from Taylor or Browning, that the employees gave him the instructions, and that he was acting in his Union capacity. Paige said he told Grievant that by taking the instructions, he had interfered with Browning's ability to comply with them. Paige said Grievant's Union representatives began asking questions which he decided were not pertinent, and he terminated the hearing. By that time, Paige said, the Union had not presented any defense, had not denied that Grievant took the instructions or that Grievant told the box pullers they did not have to comply with Berry's instructions.

22

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000023

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 23 of 35 PageID #:104

Following the hearing, Paige prepared a Recommendation for Discharge and sent it to Naranjo. The recommendation said Grievant told Taylor and Browning that they did not have to comply with the instructions and that he took the instruction sheets. The recommendation said both Browning and Taylor told Berry that Grievant said they did not have to follow Berry's instructions. Paige said Grievant was charged with the behavioral violations of Conduct Unbecoming an Employee and Insubordination. He was also charged with Disrespect to Supervisory Personnel. The recommendation noted that Grievant had a second level discipline for a behavioral violation imposed on July 12, 2015, which was the subject of Grievance 15-0634, above.

The video was shown during Paige's cross examination. The first view is from inside the bus taken from about the driver's location. Grievant's arms can be seen driving the bus. He pulls into the vault island at about 18:39:35 and opens the door. A man later identified as Browning is standing at a booth on the island. He enters the bus shortly before 18:40 and begins to remove the cash box. At 18:40:02 he appears to say something. At that point, Grievant is bending over and facing away from Browning. His arms and face are not visible. Browning left the bus with the cash box at 18:40:09. Browning reenters the bus at about 18:40:47 and appears to say something to Grievant, who has now straightened up. At about 18:40:49 Grievant is writing something in a small notebook. Browning leaves the bus at 18:40:51, retrieves a paper from the booth and, at 18:41, hands it to Grievant inside the bus. This is the period in which Paige captured the still shots. Grievant puts the paper in a bag or back pack and, at 18:41:32, pulls away from the vault island.

Another view of the same time period was taken by an outside camera on the front driver's side of Grievant's bus. The view shows a booth area on that side of the bus, which

23

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000024

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 24 of 35 PageID #:105

apparently services the vault island adjacent to the lane Grievant used. At about 18:40:09, an employee identified as Taylor enters the booth area, picks up some paper or papers and leaves the booth area, passing outside of the camera's view at 18:40:13. He walks toward the front of Grievant's bus, but the front of the bus – and, in particular, the driver's side window – is not visible in the video. At 18:40:18, Taylor returns to the booth without the paper. The Union contends Taylor took the paper from the booth, walked to the front of the bus, handed the paper to Grievant through the driver's side window, and then returned to the booth. Browning had left the bus with the cash box at 18:40:09 and did not return until 18:40:47.

Senior Manager Naranjo held a discharge meeting with Grievant and his Union representatives on February 11, 2016. Naranjo said at the beginning of the meeting, Union officials asked that Grievant be put back to work and said the hearing was unfair because Grievant was a member of the Union's executive board and had been working in a Union capacity. Naranjo said he asked whether the representatives believed Grievant had interfered with the operation, and all denied it except one person, who said Grievant interfered inadvertently. Naranjo said Grievant was on the clock and never identified himself as working in a Union capacity. He also said the Union representatives agreed that if Grievant had not been a Union officer it would be "okay for us to proceed with discharge."

Naranjo said he told Grievant there were allegations he had told the box pullers not to follow Berry's direction and that he had taken the box pullers' written notices; Grievant, he said, did not respond to either charge. Naranjo said his decision to discharge Grievant was based on the fact that Grievant did not deny the charges. He said Grievant was insubordinate when he told the box pullers not to follow a direct order from Berry and that he engaged in conduct unbecoming an employee because he questioned Berry about his actions, and took the

24

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000025

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 25 of 35 PageID #:106

instructions Berry had given the box pullers. Taking the instructions also violated the rule requiring operators to use their best judgment. Grievant was guilty of disrespecting a manger because he called Paige a pipsqueak and he "disrespected" Paige during the hearing. These were behavioral violations, Naranjo said, and warranted discharge. Naranjo said he was undecided about what the proper discipline should be prior to the hearing. He also considered Grievant's previous behavioral violation and determined there were no mitigating circumstances.

Union First Vice President Valerie Matthews testified that she attended the discharge meeting and that she denied Naranjo's assertion that Grievant had gone off the bus and taken the written instructions from Browning. She said she also denied Naranjo's charge that Grievant had told the two employees not to follow Berry's instructions. Matthews said Taylor had told her that Grievant did not advise him to ignore Berry's instructions. During the meeting, Matthews said, another Union representative asked Naranjo how Grievant had been insubordinate, and Naranjo replied that Grievant had told Berry to cease and desist. The Union representative responded that Grievant had been acting in a Union capacity. On cross examination, Matthews agreed that when she was a clerk she had complied with instructions to tell an employee to see a manager.

Grievant testified that when he pulled into the vault, Taylor came to his driver's side window and said Berry had told him to tell other employees to see Berry, and Taylor asked, "Is that my job description?" Grievant replied that he would look into it. Grievant said he wrote down Taylor's comments, and that Taylor handed him the instruction sheet through the window. Subsequently, Browning gave Grievant his instruction sheet. Neither box puller asked Grievant to return the instructions. Grievant denied telling either Taylor or Browning they should not follow Berry's instructions. Grievant said he approached Berry and asked him if he was having

25

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000025

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000026

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 26 of 35 PageID #:107

box pullers perform management work. Grievant said he did not hear Taylor's response, if any, and that he left to go to the restroom. When he returned, he again approached Berry and told him that CTA had to bargain with the Union before it could change the working conditions, and he asked Berry to cease and desist. Grievant said Berry responded, "I've got nothing to say to that," and Grievant left.

Grievant denied objecting to Paige presiding over the investigatory meeting, although he did object to the meeting itself. Grievant said he thought it was not a disciplinary matter but, rather, an issue between management and the Union. Grievant also said he asked Paige prior to the meeting why it was not being chaired by Naranjo or someone higher in management. On cross examination, Grievant said if he had realized the instructions dealt with a serious issue, he would have told the employees to comply and then file a grievance. However, he denied telling the box pullers not to follow Berry's instructions. As I understood Grievant's testimony, he believed the issue had to do with changing working conditions and the parties would discuss the issue later. Grievant said he used the word "pipsqueak" in reference to Paige, but in the context of a private meeting with the Union's Second Vice President. CTA also referred to notes Grievant had made on or about February 9, in which he said he responded to Taylor's question about whether he had to inform coworkers to see management by saying he thought that was the work of management, but he would try to find out.

Positions of the Parties

CTA argues that Grievant was insubordinate on February 2, 2016, when he told the box pullers that they did not have to perform Manager Berry's instructions and then took possession of Berry's written instructions, thus preventing them from complying. It is no defense, CTA

26

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000027

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 27 of 35 PageID #:108

says, to claim that Grievant merely accepted, rather than took, the instructions – he believed the instructions were evidence of Taylor's complaint about performing work outside his job description, and he did not return the instructions to the employees. During the investigation, the Union says, Grievant did not deny telling Taylor he did not have to perform the work. Also, CTA insists, Matthews' hearsay testimony that Taylor said Grievant did not tell him to disobey the instructions is not believable, especially since it contradicts the statement Taylor gave Berry. CTA also points out that Grievant admitted telling Taylor that the assigned work might be outside the box pullers' job description, and that, given his Union office, they could have believed that he had the authority to tell them not to do the work.

CTA says there is a long-standing past practice of using bargaining unit employees to notify bus operators to report to a manager, and that Grievant was aware of the practice. The Union did not advance any reason the practice should not apply in this case, CTA points out, and, had there been any, Grievant would have mentioned it in his investigation or discharge meetings. Grievant also understood that the prevailing practice in cases like this one is to obey now and grieve later, which Grievant said he would have followed had he realized the instructions concerned a serious matter. This adds to the charge of insubordination, CTA contends, a violation that, of itself, can warrant discharge. It is of no consequence, CTA argues, that Grievant did not receive a direct order from Berry. His actions amounted to a defiance of authority, which is one definition of insubordination. Finally, CTA says Grievant showed disrespect to a manager – Paige – by telling other employees he was a pipsqueak.

The Union says CTA's claim is that Grievant was insubordinate because he instructed the box pullers not to follow Berry's instructions. But, the Union again relies on CTA's definition of insubordination in the CAG: "Insubordination (failing to obey a direct order from supervisory,

27

managerial or executive personnel)." Grievant, the Union points out, did not receive a direct order from Berry or any other manager or supervisor. Nor would Grievant be guilty of insubordination even if no direct order were required in these circumstances, the Union says. Grievant did not tell the box pullers to ignore Berry's instructions and, when he left the vault area with the instructions, he was not aware that the box pullers had not yet informed two of the operators on the list, and had no way to know that he was preventing them from performing their duties. The Union also says there is no direct evidence that Grievant instructed the box pullers to ignore Berry's instructions. Grievant's statement, prepared about a week after the incident, denies Taylor's statement, which says Grievant said "we should not perform duties of management."

The statements from both Taylor and Browning were hearsay, the Union contends, because they were out of court statements offered for the truth of the matter asserted and did not satisfy any of the recognized hearsay exceptions. In particular, the Union says the circumstances show the statements lack the necessary indicia of trustworthiness. The two employees did not complete the statements until after Berry approached them and told them they had failed to comply with his instructions, meaning they were faced with possible charges of insubordination. The statements, then, can be considered an attempt to divert blame toward Grievant and away from themselves. The Union also says Browning's credibility is questionable since he falsely said Grievant removed the instruction sheet from his work station; but the video clearly shows that Browning handed his instruction sheet to Grievant. CTA could have called the box pullers to testify, the Union says, but did not do so, thus depriving the Union of the opportunity to test their claims under cross examination. Finally, the Union says even if the statements are given weight, Taylor's statement does not support CTA's claim that Grievant told him not to comply

28

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000029

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 29 of 35 PageID #:110

with Berry's instructions; rather, the statement says only that employees "should not" have to perform management work. This was not a direction for Taylor to ignore Berry's instructions.

The Union also contends that it was not improper for Grievant to question Berry about the work assignment or to ask him to cease and desist. He was not discourteous and he made no demands. And, as a Union official, it was within Grievant's authority to raise the issue. Finally, the Union says Grievant should not have been disciplined for referring to Paige as a pipsqueak during a private conversation with other Union members after the investigation meeting.


Findings and Discussion for Grievance 16-0122

As discussed in Grievance 15-0634, CTA's Corrective Action Guidelines define insubordination as the failure to follow a direct order from management. In that case, CTA could not establish that a manger issued Grievant a direct order. The same thing is true in this grievance; Berry issued no orders to Grievant. But to end the analysis there would lead to absurd results. It would mean that a Union official could tell employees not to perform their assignments, thereby putting those employees at risk of insubordination, but without any consequence to the Union official because no one had instructed him not to interfere with work assignments. This is untenable. CTA has the right to manage its workforce and, if an employee believes a work assignment is improper, his recourse, absent some exceptions not present here, is to perform the work and then file a grievance. Grievant was aware of this procedure and, if he deliberately advised employees to ignore it and refuse to perform the work, then he would have undermined the core of CTA's definition of insubordination. The crucial factual issue in the case, then, is whether Grievant told Browning and/or Taylor not to perform the work.

29

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000030

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 30 of 35 PageID #:111

CTA's only evidence about what Grievant said to Taylor and Browning comes from the statements the two employees prepared at Berry's direction. As I said at the hearing, the rules of evidence do not apply in arbitration, and it is not uncommon to admit statements from absent employees and accord them some weight. But even if the two statements were to be taken at face value, they would still be subject to the same credibility issues that would have accompanied in-person testimony. As the Union points out in its brief, Berry did not direct the two employees to complete the statements until after he had already confronted them about their failure to follow his written instructions. It is reasonable to question, then, whether the two employees saw the statements as an opportunity to acquit themselves by shifting the blame to Grievant.

There is, however, some evidence tending to support the truth of the statements. Either Taylor or Browning told one of the three employee to see Berry, and neither Taylor nor Browning claimed to have relayed Berry's instructions to the two remaining employees. One might surmise, then, that Taylor and Browning were willing to perform the work, and stopped doing it only after Grievant told them not to or, at least, told them they did not have to. But even if Taylor and Browning elected not to do the work after speaking with Grievant, there is no compelling evidence that Grievant told them they did not have to do the work or that he knew they had not yet completed it. Taylor's statement says "speaking to [Grievant, he] says we should not perform duties of management and supervision, after informing one of the operators." It is not clear from this, however, whether Taylor told Grievant he had only informed one of the operators and Grievant instructed him not to tell the other two. In addition, Taylor said Grievant told him "we should not perform duties of management," which is not inconsistent with

30

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000031

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 31 of 35 PageID #:112

Grievant's claim that he responded to Taylor's question by telling him he did not know whether Berry could assign those duties, but that he would find out.

It may be that Taylor understood Grievant's comment that "we should not have to do" management's work as a direction not to do it, or as an authoritative statement that they did not have to do it. Grievant, after all, was the highest ranking Union official in a large garage (more than 600 drivers) and it would be reasonable for employees to take his advice seriously. Nevertheless, there is nothing in Taylor's statement that says he told Grievant that not all of the operators had been notified. Browning's statement does not say that Grievant told him not to do the work; rather, he said he could not do it because Grievant took his instruction sheet. But it is clear from the tape that he gave the sheet to Grievant voluntarily and then did nothing to retrieve it before Grievant left the area. One might question whether the absence of the instruction sheet would have precluded Browning from completing the assignment since there were only two employees left to be informed. Moreover, there is nothing in Browning's statement that rebuts Grievant's testimony that he did not know Browning had not yet finished the assignment.[3]

These are the kinds of issues that might have been clarified on direct examination, or explored on cross examination, and which could not be addressed without in-person testimony. . Both Taylor and Browning were disciplined as a result of the incident, with Taylor receiving a behavioral violation, a fact that could have influenced CTA's decision about the advisability or the value of calling them to testify in the instant case. This Award is not intended as a criticism of CTA's judgment on that issue. But discharge is the most serious discipline an employer can

---

[3] The Union seeks to undermine Browning's credibility by claiming that he lied to Berry when he said in his statement that Grievant "removed the sheets from my work station." Both at the hearing and in its brief, the Union stressed that Grievant could not have done so because he never got off the bus and went to the booth or to the vault island, which the Union says was Browning's workstation. But this mischaracterizes the statement, which I understood to mean only that once Browning gave Grievant the document, Grievant left with it, thus removing it from Berry's work area. That is what happened.

31

impose, and my review of the evidence, including the two statements, does not convince me that CTA carried its burden of demonstrating that Grievant told or advised Browning and Taylor not to perform the work Berry assigned.[4]

I also cannot find that Grievant acted improperly when he questioned Berry about the work assignment. According to Berry, Grievant asked him, "Since when do box pullers have to do the job of managers and supervisors?" Berry apparently understood that Grievant's comment was related to the written instructions, and he responded that he had the right to direct the employees. Grievant did not argue with him or otherwise challenge his authority – he simply left the area. When he returned, according to Berry, Grievant said, "I am requesting that you cease and desist," and Berry said he responded, "I'm not even going to entertain that," and Grievant left. Again, Grievant did not argue with Berry, he did not raise his voice, and Berry said Grievant was not disrespectful. There was nothing improper about Grievant challenging the work assignment, or about his request to cease and desist. Grievant was a Union representative and he dealt with Berry as such on a regular basis. Part of Grievant's responsibility was to protect the rights of bargaining unit employees, which could include not having them assigned to certain kinds of work. Even if Grievant knew that bargaining unit employees had been given the same duties in the past, that would not preclude him from questioning the assignment, as long as he did not undermine Berry's authority by telling the two employees not to do the work.[5]

---

[4] CTA points out that the Union could have called Taylor to support Grievant's claim that Grievant did not tell him to ignore the written instructions, even though doing so might have subjected Taylor to discipline for having falsified his statement. But CTA has the burden of proof, a requirement that is not affected by the Union's decision not to call Taylor.

[5] Grievant's interchange with Berry also reinforces my conclusion that CTA did not prove Grievant told Taylor and Browning not to perform the work. Had he done so, I have difficulty believing Grievant would have simply left the garage after Berry denied the cease and desist request. Grievant would have known that his instructions to the two box pullers would have left them vulnerable to serious discipline. Given Grievant's attitude toward his Union obligations, had he told the employees not to do the work, it

32

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000033

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 33 of 35 PageID #:114

CTA also argues that Grievant's failure to deny Taylor's and Browning's allegations was evidence of his guilt. Naranjo testified that Grievant's silence in the February 11 meeting was what convinced him to discharge Grievant. However, Grievant appeared at the hearing with several high ranking Union officials to represent him. One of them – Matthews – testified credibly that she denied the allegation that Grievant told the two employees not to comply with Berry's instructions. In such circumstances, it was reasonable for Grievant to defer to his representative's actions. CTA also asks me to consider the fact that during the discharge meeting, Matthews asked Naranjo to give Grievant a "concession," because he had been acting in his role as a Union representative. Implicit in this request, CTA argues, was the Union's recognition that Grievant had engaged in the conduct. But I understood this request to be related to Grievant's having asked Berry to cease and desist. This was the last subject addressed on direct examination and the concession question was asked near the beginning of cross examination. As already discussed, Grievant was acting as a Union representative when he asked Berry to cease and desist and it would have been reasonable for Matthews to ask Naranjo for a concession on that issue.

The remaining allegation is that Grievant disrespected Paige by calling him a pipsqueak. Grievant does not deny that he referred to Paige by that name, although he said it was during a private conversation with the Union's Second Vice President. Paige's statement says that near the end of the February 9 meeting, Grievant told Paige that Union Vice President Matthews wanted to ask Paige some questions. Paige said he declined because he had already decided to recommend that Grievant be discharged. Grievant then said he was going to the drivers' area to address drivers. He asked Matthews to accompany him immediately, but she refused. Paige said Grievant left the office and he "overheard [Grievant] telling the drivers that 'this pipsqueak

---

seems likely that he would have more fully engaged Berry about retracting the assignment, or would have returned to the vault aisle and told the employees to do the work.

33

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000034

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 34 of 35 PageID #:115

manager had insulted the vice-president by not allowing her to question him.'" The Union characterizes this as a "private conversation" Grievant had with other employees. But the conversation took place on CTA property, and Grievant apparently spoke loudly enough for his comments to be overheard by Paige, who was still in the office, and obviously anyone else within earshot. There is no indication that Grievant spoke to the other operators in an office, or in any other area where Grievant had a reasonable expectation of privacy. Certainly, Union officials who are engaged in dealings with management are accorded more leeway than other employees, and this can extend to descriptions of management positions in bargaining or other official functions. Although Grievant was certainly free to criticize the way Paige handled the meeting, he was not privileged to make an ad hominen comment about Paige. I find that doing so violated Rule 14(x) and is properly treated as a behavioral violation.

The CAG says disrespect to management can be cause for accelerated discipline. My impression of Grievant from the hearing – and from credible testimony from CTA witnesses about his conduct and comments during the February 9 and February 11 meetings – is that he can be difficult for managers to work with. Some of that may be due to the zeal with which Grievant apparently attends to his Union functions. But even so, I find that this isolated comment does not warrant accelerating the discipline beyond the first step level. Thus, I find that Grievant should be issued a final warning and a 1-day suspension for this violation.

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000035

Case: 1:20-cv-03356 Document #: 1-5 Filed: 06/08/20 Page 35 of 35 PageID #:116

<u>AWARD</u>

Grievance 15-0634 is sustained.  The discipline is to be removed from Grievant's record and he is to be made whole for the monies lost in his 3-day suspension.  Grievance 16-0122 is sustained, in part.  Grievant is to be reinstated and made whole.  Grievant violated Rule 14(x), as explained in the Findings, and is to be issued a final warning and a 1-day suspension.  I will retain jurisdiction for a period of 30 days to resolve any issues concerning the remedy.

_____

Terry A. Bethel, Neutral Arbitrator
October  , 2016

_____

David Lichtman, Union Arbitrator
October   , 2016

_____

Mona Lawton, CTA Arbitrator
October   , 2016

35

Slater v. CTA 1:20-cv-3356 Cmplt. Ex. 5 000035