UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EREK SLATER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 20 C 3356 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| CHICAGO TRANSIT AUTHORITY, ) | |
| A MUNICIPAL CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

After Plaintiff Erek Slater, a CTA bus operator, began multiple discussions with other CTA bus operators about the safety of transporting police personnel to demonstrations occurring in Chicago, his employer, Defendant Chicago Transit Authority ("CTA"), removed him from service. Slater brought this action, alleging that the CTA violated his First Amendment right to free speech. Slater filed a complaint and a motion for a temporary restraining order ("TRO") in this Court on June 8, 2020. Slater asks the Court to enjoin the CTA's alleged prohibition of disfavored speech and order the CTA to return him to active service. Because Slater's likelihood of success on the merits is less than negligible, the Court denies his motion [2].

## BACKGROUND

Between May 30, 2020 and June 4, 2020, the CTA allowed bus operators to pick their work assignments for the next three months at the North Park Bus Garage (hereinafter the "pick"). Due to COVID-19, the CTA implemented certain measures to promote social distancing during the pick. Specifically, the CTA modified its ordinary pick process by assigning employees a time to pick, only permitting authorized CTA personnel on the property,

limiting the number of employees on site, and re-purposing the breakroom and picnic table area into workspaces. The CTA conducted the pick in the breakroom and limited the capacity to 15-20 bus operators. Outside of the breakroom, in the picnic table area, employees waited to pick in a staging area. CTA Bus Operations Senior Manager Jeffrey Smith supervised the pick, and Slater or Baseemah Dear-Townsend were present on behalf of the Amalgamated Transit Union Local 241 ("Local 241"), the certified labor organization representing CTA bus operators. During the pick, bus operators are off-the-clock and unpaid.

On May 30, Dear-Townsend attended a Local 241 video meeting in which Local 241 communicated to the CTA that it was permissible for bus operators to transport police officers to demonstrations occurring in Chicago. Doc. 53 at 88:1–3 ("The union's position was that although we have always carried the police and always did police charters, we are not to -- no operator should carry detainees."). Dear-Townsend recalled that Slater attended the meeting. Doc. 53 at 111:10–12. Slater claims that—despite his role as an Executive Board Member of Local 241—he had no knowledge of this meeting and did not attend. Doc. 49 at 4. Instead, Slater alleges that one day earlier, the Local 241 executive board "unanimously voted to support the ATU Local 1005[1] efforts to end the enlistment of bus operators to shuttle police to demonstrations and shuttle arrested demonstrators away."[2] Doc. 49 at 4.

---

[1] ATU Local 1005 represents bus operators in Minneapolis, Minnesota. *See* http://atu1005.com.

[2] Slater cites his Facebook post on May 30 at 1:09 a.m. as evidence of Local 241 Executive Board's decision. Notably, this post only indicates that the decision related to transporting protestors arrested by police, not transporting police personnel to demonstrations, as Slater suggests. In this post, Slater states that "a few hours ago" the President of the CTA and Local 241 "directed bus operators to refuse to transport people arrested for protesting the police killing of George Floyd." Doc. 50-2. Slater quotes Local 241 President Keith Hill as saying: "If the police ask you to use your bus to remove protesters by arrest please let them know it's unsafe and refuse." *Id.* According to Slater's post, Hill did not mention transporting police to protests.

On May 31, Dear-Townsend ran the pick on behalf of Local 241. Slater arrived around 7:30 a.m. because he was scheduled to pick his work assignment at 9:00 a.m. Slater wore his CTA uniform that day because it was the final day for a uniform inspection. Slater was not there on behalf of Local 241. Soon after Slater arrived, Smith overheard Slater speak about a communication he received from Hill to other bus operators who were picking their assignments. According to Smith, Slater told bus operators that they were not to transport detainees or protestors; Smith agreed these instructions were consistent with CTA's policy. Doc. 53 at 47:1–14. Smith then heard Slater instruct bus operators not to transport any police personnel and state that "the president said they're to refuse for the police shuttle." *Id.* at 47:16–48:1. This was contrary to Smith's understanding of Local 241's position, so Smith contacted the vice president of bus operations and spoke with Dear-Townsend, the on-duty union steward, to confirm his understanding. Smith then told Slater to contact Hill because Hill had agreed that it was permissible for bus operators to transport police officers. Slater replied that he was relaying the international president's comments and proceeded to inform bus operators not to transport police personnel. Smith next informed Slater that if he continued to tell operators to refuse work, he would promote a work stoppage or slowdown in violation of CTA rules. Dear-Townsend confirmed this series of events during her testimony. Additionally, after Dear-Townsend heard Slater misrepresent Local 241's position, she informed bus operators participating in the pick that Local 241 has always sanctioned driving police shuttles. *Id.* at 90:24–95:8. According to Dear-Townsend, at this time, "aggression was building," Slater became "louder and louder," and yelled at Smith "Do you understand my amendments and my rights?" *Id.* at 93:16–21. Soon after, Dear-Townsend announced that employees should leave the garage if they completed their pick. Slater replied that he was an executive board member and did not have to leave. Smith

3

repeated Dear-Townsend's instruction, Smith and Slater had another brief interaction, and Slater went outside.

Slater proceeded to repeat the same statements to employees that were outside in the staging area for the pick. Again, Smith heard Slater tell approximately 25 bus operators that the international president said they could refuse to transport police personnel. Smith repeated to Slater that he could not promote a work stoppage or slowdown and asked Slater to leave the premises. Slater replied that Smith was breaking up an official union meeting. Slater refused to leave the property, and Smith requested assistance from the Chicago police department. Slater left before police officers arrived. Slater contends that he asked a group of bus operators outside for permission to hold a discussion about "important matters to them" and they "voted to hold a discussion." Doc. 49 at 9–10. Slater alleges that he then read the international union's statement about the ongoing protests and attempted to hold a vote about whether the bus operators felt safe transporting police personnel.

Overall, Smith and Dear-Townsend testified that Slater's speech in the breakroom interfered with the pick operation and that the relevant pick group finished an hour late. Doc. 53 at 30:17–31:17. Dear-Townsend testified that during the pick, Slater claimed it was unsafe to transport police personnel because they had "riot gear," and at some point, Slater suggested that the CTA supply firearms to bus operators. *Id.* at 92:19–93:9; 111:13–113:11. Bus operators Jarita Coleman and Derrick Calhoun testified that they did not observe any disruption to the pick due to discussions amongst workers. Doc. 54 at 283:17–19; 290:20–22. Coleman also testified that she never heard Slater instruct operators to refuse to transport police shuttles. *Id.* at 283:13–16.

4

On June 1, Slater returned to the North Park Bus Garage to supervise the pick on behalf of Local 241. Dear-Townsend testified that Slater continued to tell operators they should not be transporting police officers at "[e]very opportunity he was able to gather operators around him." Doc. 53 at 97:23–25. Smith testified that he heard Slater raise safety concerns about transporting police officers and say that bus operators should be able to carry guns. *Id.* at 20:16–24. Again, Smith asked Slater not to go down the road of promoting a work stoppage. Slater's comments caused concern amongst some bus operators, and Dear-Townsend found them alternate routes or offered them the day off. Additionally, Smith explained that if a bus operator felt unsafe, he would reassign their bus route, they could use a paid vacation day, or they could request the day off. According to Slater's complaint, he spoke with a group of eight bus operators and later a group of five bus operators in the breakroom. Slater alleges that he raised the same concerns that he raised the previous day while bus operators ate their lunch. Doc. 49 at 10.

On June 3, Slater again reported to the North Park Bus Garage. Smith asked Slater to leave the clerk's area, based on his belief that Slater was not assigned to work the pick. Slater insisted he was there for official union business. The police ultimately escorted Slater off the property after he refused to leave. Slater returned to the North Park Bus Garage on June 4, and both he and Dear-Townsend worked the pick. Slater continued to tell bus operators not to drive police shuttles. On June 5, 2020 at approximately 5:45 a.m., Slater reported to the North Park Bus Garage to drive his scheduled bus route. When Slater scanned his badge to begin his shift, the machine informed him to see the manager. Slater reported to the on-duty manager, Tony Wojewocki, who informed Slater that CTA took him out of service because he promoted a "work stoppage." Wojewocki issued an "interview record" that alleged a behavioral violation on May 31, 2020 and cited the following rule violations: (1) insubordination (General System Rule

5

14(d)); (2) conduct unbecoming of an employee (General System Rule 14(e)); (3) disrespect to supervisory personnel, co-workers, or the public (General System Rule 14(x)); (4) general information (System Rule B(1)); and (5) prohibited activities (System Rule B2.6). Slater signed the interview record under protest. Slater proceeded to the breakroom to discuss with other bus operators that CTA had taken him out of service and disciplined him for exercising his First Amendment rights. Wojewocki entered the breakroom and ordered Slater to leave the premises. Chicago police officers arrived shortly thereafter, and Slater complied with the order.

The Court held an evidentiary hearing on June 11, 2020 and June 15, 2020. The CTA called Smith and Dear-Townsend as witnesses. Slater testified on his own behalf and called Coleman and Calhoun as witnesses. The CTA filed its response to Slater's motion for a TRO on June 22, 2020, and Slater filed a reply the following day.

## LEGAL STANDARD

Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted). The party seeking such relief must show: (1) it has some likelihood of success on the merits; (2) there is no adequate remedy at law; and (3) it will suffer irreparable harm if the relief is not granted. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018).[3] If the moving party meets this threshold showing, the Court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019)

---

[3] Although *Planned Parenthood* involved a preliminary injunction, courts use the same standard to evaluate TRO and preliminary injunction requests. *See USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 (N.D. Ill. 2019) ("The standards for granting a temporary restraining order and preliminary injunction are the same.") (citing cases).

(quoting *Planned Parenthood*, 896 F.3d at 816). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)). The Seventh Circuit has described this balancing test as a "sliding scale": "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors*, 992 F.3d at 364 (citing *Planned Parenthood*, 896 F.3d at 816). Finally, the Court considers whether the injunction is in the public interest, which includes taking into account any effects on non-parties. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

## ANALYSIS

In First Amendment cases, the likelihood of success on the merits "is usually the decisive factor." *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014). "The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (citation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Barland*, 751 F.3d at 830 (same). Therefore, the Court limits its analysis to the likelihood of success on the merits and the balance of harms.

**I.     Likelihood of Success on the Merits**

"[T]he threshold for demonstrating a likelihood of success on the merits is low." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). "[T]he plaintiff's chances of prevailing need only be better than negligible." *Id.* In his motion for a TRO, Slater argues that he is likely to succeed on his claims because the areas in which he began discussions with other CTA bus operators have long been used as public forums, creating a First Amendment right for such discussions. Specifically, Slater contends that these areas are designated public forums and there was no compelling interest to stop his speech. Further, Slater argues that even if these areas are nonpublic forums, singling out his speech for different treatment violates the First Amendment. Contrary to Slater's suggestion, a forum analysis is inapplicable here because Slater challenges the CTA's actions as his employer. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("A government entity has broader discretion to restrict speech when it acts in its role as employer."). Instead, the Court evaluates Slater's speech as a public employee under the standard set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti*. *See Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011) (*Pickering* and *Garcetti* hold that "where the government acts as both sovereign *and employer*, th[e] general forum-based analysis does not apply"); *see also Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.").

To prove a First Amendment retaliation claim, a public employee like Slater must show: (1) his speech was constitutionally protected; (2) his speech was a cause of the CTA's action; and (3) he suffered deprivation as a result. *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016) (citing *Wackett v. City of Beaver Dam, Wis.*, 642 F.3d 578, 581 (7th Cir. 2011)).

8

In his reply brief, Slater states that "[t]he core issue in this case is the discrimination against Mr. Slater's speech on May 31, 2020, that led the CTA to remove him from service." Doc. 49 at 9. Therefore, the Court accordingly limits its analysis to Slater's speech on May 31, 2020.

### A. Protected Speech

For Slater's speech to receive protection under the First Amendment, he must demonstrate that (1) he spoke as a private citizen, (2) his speech addressed a matter of public concern, and (3) the government's interests as an employer in promoting effective and efficient public service do not outweigh his interest in expressing that speech. *Kristofek*, 832 F.3d at 792. The Court considers each factor in turn.

#### 1. Speaking as a Private Citizen

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. However, a public employee's speech "does not lose protection simply because it 'concerns' or is 'acquired by virtue of [] public employment.'" *Kristofek*, 832 F.3d at 793 (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). Similarly, "public employees' speech is not subject to restriction simply because it occurs inside the office, since '[m]any citizens do much of their talking inside their respective workplaces.'" *Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013) (quoting *Garcetti*, 547 U.S. at 420–21). The Seventh Circuit has explained that "speech does not 'owe[] its existence to a public employee's professional responsibilities' within the meaning of *Garcetti* simply because public employment provides a factual predicate for the expressive activity; rather, *Garcetti* governs speech that is made 'pursuant to official duties' in the sense that it is 'government employees' work product' that has been 'commissioned or

9

created' by the employer." *Id.* (quoting *Garcetti*, 547 U.S. at 422). To determine whether Slater's speech was made pursuant to his official duties, the Court conducts a practical inquiry into the duties Slater was expected to perform, not limited by his formal job description. *See Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016) (citation omitted).

Here, the CTA employed Slater as a bus operator. Although neither party includes a description of Slater's responsibilities, it appears his duties at least included driving a bus, picking a route, and undergoing a uniform inspection. Slater spoke to other employees about a CTA policy while on CTA property picking his route. The CTA did not commission Slater's speech and the facts do not indicate that he spoke pursuant to his official duties. *Cf. Garcetti*, 547 U.S. at 422 (prosecutor's internal memorandum addressing proper disposition of pending criminal case was written pursuant to official duties). Instead, Slater's speech is analogous to discussing politics with a co-worker or a complaint about a CTA practice. *See id.* at 423–24 (noting that discussing politics with a co-worker or complaints like those at issue in *Connick v. Myers*, 461 U.S. 138 (1983), retain the possibility of First Amendment protection); *see also Lanahan v. Cty. of Cook*, No. 16 C 11723, 2018 WL 1784139, at *6 (N.D. Ill. Apr. 13, 2018) (plaintiff raised pay complaints as a private citizen); *Rose v. Haney*, No. 16-CV-5088, 2017 WL 1833188, at *5 (N.D. Ill. May 8, 2017) (speech about improving teacher evaluation process was not speech expected of adjunct professor and he therefore spoke as private citizen). While the outcome might differ had Slater reported a safety concern directly to a superior, *see, e.g.*, *Kubiak*, 810 F.3d at 482, the Court cannot conclude based on these facts that a non-supervisory employee who raises an issue with his employer's policy to his co-workers loses First Amendment protection for purposes of *Garcetti*.

The CTA's arguments to the contrary are unpersuasive. The fact that Slater made his comments while on CTA property for job-related purposes merely indicates that he spoke at his workplace. *See Chrzanowski*, 725 F.3d at 738 ("[P]ublic employees' speech is not subject to restriction simply because it occurs inside the office."). And even though Slater's speech "was directly related to" his job duties, this does not demonstrate that he spoke pursuant to those duties. Doc. 45 at 11; *see also Forgue v. City of Chicago*, 873 F.3d 962, 967 (7th Cir. 2017) (the relevant inquiry is whether a public employee's speech was "made *pursuant* to, not *about*, public employment" (emphasis in original)). Finally, the fact that Slater wore a CTA uniform is not enough to show that he spoke pursuant to official duties. *Cf. Mills v. City of Evansville, Ind.*, 452 F.3d 646, 648 (7th Cir. 2006) (on duty, in uniform sergeant with supervisory authority "spoke in her capacity as a public employee contributing to the formation and execution of official policy"). The Court finds that Slater could develop a record that he spoke in his capacity as a public employee.

On the other hand, Slater's argument that he spoke as a citizen because he addressed bus operators with a statement from the international union fails. Although a public employee's speech "is not within the purview of his 'official duties'" if he speaks in his capacity as a union official, Slater does not specify whether he was speaking in such capacity. *Olendzki v. Rossi*, 765 F.3d 742, 747 (7th Cir. 2014) (citation omitted). Moreover, a union official's communication is not per se protected under the First Amendment and "communication that the union does not sanction is not insulated from employer discipline." *Id.* Here, the facts do not suggest that Slater spoke in his capacity as a union official on May 31. Slater was on the property to pick his work assignments and undergo a CTA uniform inspection, and Dear-Townsend was the union representative assigned to supervise the pick. Moreover, Slater's

11

speech conflicted with Local 241's position; thus, it is improbable that Local 241 sanctioned his speech. *See, e.g.*, *id.* at 748 (plaintiff spoke as a citizen at meetings that were a condition of his appointment as a union official and the union sanctioned the forums as a venue for him to voice concerns on behalf of union members); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (plaintiff spoke in capacity as union representative at meeting involving union and management representatives). Overall, Slater has not shown that he spoke in his capacity as a union representative; however, because other facts indicate that Slater could develop a record that he spoke as a citizen, the Court proceeds to evaluate whether he spoke on a matter of public concern.

### 2. Matter of Public Concern

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Kristofek*, 832 F.3d at 793 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). In this analysis, the Court examines the "content, form, and context" of the statements at issue. *See id.* (quoting *Craig v. Rich Twp. High Sch. Dist. 277*, 736 F.3d 1110, 1115–16 (7th Cir. 2013)). Although no factor is dispositive, content is the most important. *See id.* Overall, the Court asks "whether the objective of the speech—as determined by content, form, and context—was to bring wrongdoing to light or to further some purely private interest." *Kubiak*, 810 F.3d at 483 (citation omitted).

Here, based on witness testimony, the subject matter of Slater's speech appears to have involved two general matters: (1) whether bus operators should be required to transport police officers and (2) bus operator safety in transporting police officers. Slater contends that his

12

speech involved a matter of public concern because he addressed the public safety in response to protests and safety of bus operators. However, the facts indicate that the content of Slater's speech was limited to his view of these issues and how they affected bus operators in their professional capacity. *See Kubiak*, 810 F.3d at 483 ("[W]hen analyzing the content of the speech, the broad subject matter is not determinative, and we must instead focus on the particular content of the speech."). That is, Slater challenged the CTA's policy as it related to himself and other employees, which indicates that his speech involved a matter of private interest. *Olendzki*, 765 F.3d at 749 (speaking out about collective bargaining agreement at meetings as union representative appeared to be general grievances or only affected employee personally); *see also Connick*, 461 U.S. at 148 ("[A] questionnaire not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest.").

Additionally, the form and context of Slater's speech indicate that he sought to air a personal grievance. Slater spoke on CTA property to CTA employees to voice his disagreement with a CTA policy. This entirely internal form of communication suggests Slater's grievance was personal in nature. *See Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010). Slater did not seek to inform taxpayers of the role of the CTA in transporting police officers but instead raised this issue directly with CTA employees subject to the policy. There is no indication that Slater sought to raise wrongdoing or a public safety issue. *See Kubiak*, 810 F.3d at 484; *compare Bivens*, 591 F.3d at 561–62 (finding "there [was] no indication that [the employee] was attempting to bring an issue of wrongdoing or environmental safety to public light" where the purpose of the employee's speech was to ensure the safety of his work environment), *with Wainscott v. Henry*, 315 F.3d 844, 849–50 (7th Cir. 2003) (statement criticizing city

administration involved public concern because it was a "basic criticism" and did not elaborate on the personal effect on him). Instead, Slater was concerned with the CTA's policy as it applied to him and other bus operators and therefore involved a matter of purely private interest. *See Bivens*, 591 F.3d at 561–62 (safety of working environment did not involve matter of public interest); *see also Olendzki*, 765 F.3d at 749 (prison psychologist's comments at union meetings regarding concern about the dangers presented by mentally ill patients fell squarely within his job duty to operate the prison's healthcare unit and was not enough to convince trier of fact that comments addressed matter of public concern). Moreover, Slater's objective was to further a purely private interest, as he sought to raise his concerns about the CTA policy with other employees. *See id.* (explaining that the speaker's motive is relevant and "if the speech concerns a subject of public interest, but the *expression* addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern" (quoting *Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215, 1219 (7th Cir. 1994))).

      The cases on which Slater relies in support of his argument are not persuasive. *Gregorich v. Lund* concluded that an employee's efforts to obtain union representation for other employees touched upon matters of public concern. 54 F.3d 410, 416 (7th Cir. 1995). And *Gustafson v. Jones* found a matter of public concern where officers' speech raised a concern that an order would inhibit them from carrying out their law enforcement duties. 290 F.3d 895, 908–09 (7th Cir. 2002). It is not clear how either applies. Again, the context is particularly compelling here. Based on the facts presented at the evidentiary hearing, it appears that Slater raised the issue of transporting police officers while knowing that Local 241 sanctioned this policy and the CTA did not require bus operators to effectuate this policy. Slater caused a disruption because he decided to voice his disagreement with the policy at a time when CTA

sought to minimize employee gathering due to COVID-19. The Court does not dismiss the possibility that in other circumstances bus operator safety could involve a matter of public concern. *See, e.g.*, *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684 (7th Cir. 2014) (employee's letter "emphasized that she was writing as head of union whose members were concerned" and "its multiple references to the difficulties facing all [employees] remove[d] it from the realm of the purely personal"); *cf. Hoeft v. Dommisse*, 352 F. App'x 77, 80 (7th Cir. 2009) (an employee's complaint about job hazards may qualify as protected speech where the employee threatened to report conditions to OSHA). But the context, form, and content here indicate that Slater sought to air a personal grievance. At this stage, the Court does not find it likely that Slater will be able to demonstrate that his speech involved a matter of public concern.

### 3. *Pickering* Balancing

Even if Slater could show that he spoke as a private citizen on a matter of public concern, it is unlikely that he could demonstrate that his interest in speaking outweighed the CTA's interest in "promoting the efficiency of the public services it performs through its employees." *Swetlik v. Crawford*, 738 F.3d 818, 827 (7th Cir. 2013) (quoting *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011)). In balancing a public employee's free speech and employer's management interests, the Court considers the following factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kristofek*, 832 F.3d at 796 (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)). An actual disruption is not necessary; instead, the Court must "give substantial weight to government employers' reasonable predictions of disruption," so long as those predictions are "supported with an evidentiary foundation and . . . more than mere speculation." *Craig*, 736 F.3d at 1119 (citations omitted) (internal quotation marks omitted).

Moreover, an employee's speech is not protected, if it is "made with a reckless disregard for the truth." *Swetlik*, 738 F.3d at 827 (quoting *Brenner v. Brown*, 36 F.3d 18, 20–21 (7th Cir. 1994)). Therefore, the CTA may defeat a First Amendment claim if it shows that it removed Slater from service because Slater's "supervisors reasonably believed, after an adequate investigation, that [his] [speech] was false, even if it actually was true." *Id.* (quoting *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1506 (7th Cir. 1994)). Here, the CTA raises two arguments. First, the CTA contends that Slater's speech does not outweigh the CTA's interest in functioning as a transit agency "during a time of civil unrest in the middle of a pandemic." Doc. 46 at 20 (emphasis omitted). Second, the CTA argues that Slater falsely told bus operators that Local 241 told them to refuse to drive police shuttles, and Slater repeatedly misled bus operators by representing that he addressed them as part of official union business. Slater responds that the CTA had "no legitimate interest" in prohibiting his speech, primarily because state law protected his speech. The Court will address each argument in turn.

Here, Slater's speech caused a disruption in a problematic context. The CTA revised its pick process to minimize the number of people at the North Park Bus Garage in an effort to prevent the spread of COVID-19. Testimony from Smith and Dear-Townsend demonstrates that Slater's speech disrupted the pick. Smith testified that Slater's remarks to bus operators contributed to slowing down the pick on May 31. Doc. 53 at 23:15-18; 31:11–17. Specifically,

Slater "started [a] conversation in the middle of the pick" leading bus operators to "engage[] in a conversation" instead of choosing their work assignments, resulting in that pick group finishing an hour late. *Id.* at 30:17–31:17. Additionally, Dear-Townsend testified that Slater stood in front of the pick box between approximately 8:00 and 9:30 a.m. on May 31 and interfered with bus operators' ability to pick their assignments. *Id.* at 77:16-20. When confronted about the veracity of his statements, Slater "yell[ed] and "caused chaos." *Id.* at 93:19–20. Taken together, these facts indicate that Slater caused considerable disruption.[4] This is especially troublesome in light of the underlying circumstances. The CTA modified its pick procedures and converted workspaces to reflect social distancing measures. Smith stated that the pick occurred in the breakroom and subsequent groups of employees waited at the picnic table. *Id.* at 43:16–25. Slater first addressed bus operators in the breakroom during the pick and then initiated additional speech outside in the staging area. *Id.* at 53: 12–20. Slater directly interfered with the procedures that the CTA put in place to allow bus operators to pick their assignments in a safe and efficient manner.

Additionally, it appears that the CTA "genuinely and reasonably believed, based upon an adequate investigation," that Slater's speech was false or misleading. *See Campbell v. City of Chicago*, No. 16-CV-6000, 2018 WL 4637377, at *6 (N.D. Ill. Sept. 27, 2018). Slater's reply brief fails to address this argument. The CTA contends that Slater's statements in the breakroom during the pick that Local 241 told them to refuse to transport police officers were false. *See* Doc. 46 at 20. According to Smith, after Slater made these remarks, Smith verified with Dear-Townsend and CTA management that Local 241 did not order operators to refuse such work.

---

[4] Although Coleman and Calhoun testified that they did not observe a disruption, at this stage, the Court makes factual determinations "on the basis of a fair interpretation of the evidence before the court." *USA-Halal*, 402 F. Supp. 3d at 431 n.2 (quoting *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986)). Smith and Dear-Townsend testified at length about the disruption that Slater caused.

Doc. 53 at 47:23–48:24. And when Smith approached Slater with this information and suggested that he contact Hill, Slater said he was referring to the international union president and did not care about Hill's position. *Id.* at 49:3–13. Thus, the CTA reasonably believed that Slater's speech was misleading becuase the international union president, not the local president, disagreed with the policy of transporting police officers. However, the CTA's response brief fails to demonstrate that its decision to place Slater on leave was due to its belief that Slater's speech was misleading. *See Swetlik*, 739 F.3d at 828 (explaining that the court's task is to determine whether the defendants "voted to bring termination charges against [the plaintiff] *because* they genuinely and reasonably believed, based on an adequate investigation that [h]e had lied" (emphasis added)); *Campbell*, 2018 WL 4637377, at *6 (court must determine whether the defendant terminated the plaintiff because he believed that plaintiff provided false or misleading testimony). Nonetheless, the context of Slater's misleading statements regarding Local 241's position further demonstrates their disruptive effect. After Slater made these remarks, Smith left to confirm the information and returned to confront Slater. According to Smith, the subsequent exchange between the two occurred in the middle of the pick area, and the other operators stopped picking their assignments to observe the interaction. Doc. 53 at 50:9–19. Further, Dear-Townsend stated that "Slater started getting louder and louder . . . . yelling at Mr. Smith: Do you understand my amendments and my rights?" *Id.* at 93:19-21. In short, Slater compromised the efficiency of the workplace, interfered with the CTA's implemented safety procedures, and slowed down the pick by causing a disruption with speech that could be considered misleading. Slater's contention that state law also protected his speech does not show that his interests outweighed the CTA's interests. The CTA's interest in remedying the disruption caused by Slater's speech, especially in light of the context, outweighed Slater's

18

interest in his speech. Therefore, Slater has not shown that his speech was constitutionally protected and therefore has less than a negligible chance of likelihood of success on the merits.

## II.     Balance of Harms

Because Slater has failed to show a greater than negligible chance of success on the merits, he is not entitled to a TRO. Moreover, even if Slater had a slight chance of success, under the sliding scale approach, the less likely his chance of success the more the balance of harms must weigh in his favor. *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). Because Slater's likelihood of success is less than negligible, he must show that the scales weigh heavily in their favor. Slater cannot make this showing because he has failed to allege harms that weigh heavily in his favor.

## CONCLUSION

For the foregoing reasons, the Court denies Slater's motion for a TRO [2].

Dated: June 26, 2020

                                                                        _____
                                                                        SARA L. ELLIS
                                                                        United States District Judge